[Crim. No. 4017.   Second Dist., Div. Three.   May 22, 1947.]

THE PEOPLE, Respondent, v. JOHN FARRIS MORTON, Appellant.

Leola Buck Kellogg and Montgomery G. Rice for Appellant.

Robert W. Kenny, Attorney General, and Carl S. Kegley, Deputy Attorney General, for Respondent.

SHINN, Acting P. J.—Defendant appeals from a judgment entered upon a jury verdict by which he was found guilty of murdering his wife, Nora Hudson Morton, the crime being determined by the jury to be first degree murder and the penalty being fixed as life imprisonment. He also appeals from the order of the court by which his motion for a new trial was denied.

He advances three contentions: First, that the evidence submitted to the jury was legally insufficient to establish the corpus delicti, since it tended as strongly to prove suicide as to prove homicide; second, that if it proved homicide, it was insufficient to prove murder of the first degree, and, third, that the jury was improperly instructed in some respects and inadequately instructed in others.

Mrs. Morton was shot through the heart at approximately 7 p. m. of August 27, 1945, with a .38 caliber revolver. Only Mr. and Mrs. Morton were in their home, where the shooting occurred. There was an elevation of one-half inch from

the point of entrance of the bullet to the point of exit and a deviation of one inch to the left. There were powder marks around the wound but no burning, and the evidence was that the gun had been fired from a distance of not less than four inches. Mrs. Morton died within a few minutes. Defendant immediately went into his yard following the shot and told his next door neighbors, Mr. and Mrs. Fogelsong, that his wife had just shot herself. Within the next hour, and in the room where his wife lay dead, he made a statement concerning the shooting to Officers Stone and Potts of the Redondo Beach police force and also to Harry Peterson, the Redondo Beach Chief of Police. Officers Stone and Peterson made written notes of that statement and testified from them at the trial. Defendant's next statement was made shortly after midnight to a group of officers at the Redondo Beach police station, including Chief Peterson of the local police and several deputy sheriffs. One of these, Mr. Lynch, a statement reporter, made a record of the proceedings, which lasted approximately two hours, and that record was read to the jury. On August 31, 1945, four days after the tragedy, defendant, at great length, told the coroner's jury the details of his life with his wife and particularly described the manner in which she met her death. When the case came to trial in the superior court several months later he took the stand, told his story, and was rigorously cross-examined not only as to the shooting but also as to the intimate domestic details of his life with his wife. It appears from the foregoing that on at least five different occasions defendant made statements concerning the details of his wife's death. The jury became acquainted with all five of these recitals.

Mrs. Fogelsong testified that she saw Mrs. Morton drive into her driveway upon her return from work at about 5 p. m. and "about ten minutes to 7:00 I saw her sitting on her front steps . . . she had her head in her hands and she was sobbing hard. . . . I saw her get up and go into the house. . . . I saw her come back out of the house and get into her car . . . she was racing the motor." Immediately thereafter Mr. Morton placed his hand inside the car and the motor stopped. Mrs. Morton left the car and Mrs. Fogelsong about ten minutes later heard a gun shot. "I saw Mr. Morton right after that . . . he came out of the house and said to come over, his wife had shot herself." When they entered the house the body of Mrs. Morton was seen on the floor of the

bedroom. "Mr. Morton knelt down beside her and shook her . . . he asked her why she did it. . . . He said, 'Nora, honey, why did you do it. Tell me why did you do it?' " No answer was made by Mrs. Morton and the defendant said, " 'She took that pistol out of that drawer and shot herself.' . . . Mr. Morton said he could show me what it was all about. . . . He opened the dresser drawer, took a letter out of it and let me read it." This was a letter signed by a nephew of a former wife of the defendant, mailed to him from his former home in Kentucky. In the letter, which was read to the jury, it was suggested to defendant that he come home. "We all miss you very much, especially Aunt E. J. [Eliza Jane, defendant's former wife] . . . John, she wants you to come home. She says all has been forgiven. If you wish to write her, write me, and enclose a sealed letter in with mine. I will deliver it to her. She gave me your address and said to tell you to write her and that she would answer at once." On the back of the letter, which defendant showed to Mrs. Fogelsong, he had written the following reply: "Friend [L] : Just received your letter. . . . Glad to know your wife and kids are all okay, also your mother . . . as to me coming home, I am at home and a very nice little home at that. Plenty of work, nice climate, and I am perfectly satisfied. My wife and I expect to visit her folks and my sisters at Bardstown in the Spring." Mrs. Fogelson told the jury, "He said that she was jealous over his first wife and was afraid that he would go back to her and that is why she took her life, over that letter." (Concerning this letter and the proposed answer written on its reverse side, the defendant made the following statement a few hours after the shooting took place: "This one arrived and I got in about the time she did and she got this one out of the letter box. You turn it over on the back and you will see there is an answer I started to write. That is why she didn't burn that one because I started an answer on the back of it. I told her, I said, 'Here is this letter. You take it and mail it. I want you to know I am not trying to put anything over on you. Here is the letter. Here is the answer. You mail it back.' So it has laid there. She didn't mail it back and there it is.") Mrs. Fogelsong also testified that when she entered the Morton home by the front door she had noticed that a pane of glass had been broken and that the glass was upon the floor. Further, that "the revolver was about five feet away from

the body;" that Morton "was kneeling down by her and shaking her and talking to her . . . she never answered." Mrs. Fogelsong also stated that, in her opinion, Mr. Morton at the time was intoxicated. On cross-examination this witness testified as follows: "Q. . . . Now, do you remember him saying anything about the wife, that she came from work, rammed her hands through the window and took the gun out of the drawer and shot herself; and the last thing she said was 'Johnnie, I love you.' A. That is right. . . . Q. And then do you recall what happened after that, what Mr. Morton did? A. He was going to show me what it was all about. Q. Do you recall his crying? A. Yes, he stooped down by her, like I said before, and shook her, and said, 'Oh, my God, Nora, why did you do it? Tell me why you did it?' Q. At that time did he sit down and cry? A. He sat down on the bed and put his face in his hands, and he cried some."

Officers Stone, Potts and Chief Peterson testified to the several statements made by defendant. The reporter testified at length from his notes of the interrogation of defendant the night of the shooting. The several accounts of the shooting, as given by defendant, did not differ substantially from his testimony on the stand. There were some discrepancies, which we shall mention later, but in the main he told a consistent story of the shooting throughout and it was substantially to the following effect: Mrs. Morton was 29 years of age, defendant 56. They came from the mountain regions of Kentucky and both were experienced in the use of firearms. Defendant had been married before to one Eliza Jane, sometimes mentioned as "E. J." but he was divorced from her and she was still living in Kentucky. Defendant and Nora Morton married in 1935, and came to California in 1942. He was a carpenter and blacksmith and she went to work as a welder for a manufacturing concern. They lived in a small house which they had built at Redondo Beach. Both were given to drinking and they had numerous quarrels but had never been separated except upon two occasions when Mrs. Morton left the home for short periods. On the day of the tragedy, Morton did not work; he stayed home and during the day consumed about three-fourths of a fifth of whiskey. He was lying on the bed reading the papers when his wife returned from work at about 5 p. m. The front door was locked but both had keys. He heard her approach the house and heard the crash of glass when she thrust her hand through

the door to unlatch it. She received a slight cut on the arm. She entered the house, went to the kitchen and either poured herself a drink or warmed up a cup of coffee. She had been drinking some. She was out of the house on several occasions and there was a good deal of quarreling in the two hours preceding the shooting. Mrs. Morton resented defendant's corresponding with his first wife and was not satisfied with defendant's written statement to the nephew that he did not intend to return to his first wife. She said, ''I would rather be dead and in hell than see you return to E. J.'' Another source of trouble between them was an illicit affair between Mrs. Morton and one Dallimore, a married man with whom she had become acquainted at her place of employment. We shall refer to this later.

In considering defendant's contention that the evidence was insufficient to prove a homicidal death, we are obliged to consider only the circumstantial evidence, since the jury rejected the testimony of defendant that his wife committed suicide. The crucial circumstantial evidence is that which tends to show a reason or motive for Mrs. Morton to commit suicide and that which tends to show a motive of defendant to kill his wife, and in addition thereto, the evidence of the physical facts of the shooting. We shall discuss the evidence from the standpoint of the defendant and from the standpoint of the People, taking up first the undisputed evidence as to the position of the gun with relation to Mrs. Morton's body at the time the shot was fired and the course of the bullet, which, except for the deviation of an inch to the left and a half inch upward, passed straight through Mrs. Morton's body. The People, in attack upon the theory of suicide, contended at the trial that it would have been impossible for Mrs. Morton to have held the gun at least four inches from her body, pointed straight through her body, and to have pulled the trigger with the index finger of either hand. This contention has firm support in certain established physical facts. The gun is a .38 caliber, double action, Smith & Wesson, of the ''lemon squeezer'' type. It has a heavy trigger pull, $11\frac{1}{2}$ pounds, which, of course, must be overcome in order to operate the double action of the gun. The term ''lemon squeezer'' refers to the safety action, which is operated by pressure on a bar extending the length of the butt of the gun at the back. This bar must be depressed

against the tension of a spring to release the safety and permit trigger action. A firm grip on the butt is required to release the safety. With the gun held four inches from the body, the wrist turned as nearly as possible to a 90 degree angle, and the butt held firmly in the hand, with the safety bar depressed, it is practically impossible to operate the trigger with the index finger, against the 11½ pound pull, whether the gun be held in one hand or in both hands. Defendant's gun expert, Mr. Moxley, and the prosecution's expert, Mr. Layne, testified substantially to this effect, but Mr. Moxley also testified and illustrated that the gun could have been fired easily, using the thumb on the trigger instead of the index finger, and that he had seen many cases in which the thumb had been so used. At the trial it was insisted, on defendant's behalf, that the trigger could have been pulled with the index finger of either hand so as to fire the shot in the direction it was fired, although it would have been easier with the right hand. It appears from the record that defendant's attorney made unsuccessful attempts to illustrate to the jury that it could be done. Even on appeal defendant refuses to alter his position and he places no reliance whatever upon the testimony of Mr. Moxley that the easy, natural, and simple way would have been to pull the trigger with the thumb. Defendant made several statements to the effect that his wife took the gun from the dresser drawer and shot herself while holding it in her left hand. He testified that in target practice before coming to California she had fired a revolver with her right hand. In his testimony as to the manner in which she was holding the gun immediately after the shot was fired, he illustrated the position to the jury. It was vaguely described for the record as follows: "The side of the gun directly against the stomach with the right hand open pressing the barrel—I mean the butt, and the left hand open and pressing the barrel against your side." And he testified, in answer to his counsel's question, that she had the butt of the gun in her right hand and that the barrel was toward the left side. He also testified: "*It seemed she was momentarily paralyzed in that position* and then her arms dropped and the gun fell and bounced out on the floor of the carpet." He also testified that he did not see the gun as the shot was fired and that his statements that she fired it with the left hand were based upon an impression that he got from the fact that she was left-handed. The issue which was determinative of the

question of guilt was tried as if the answer depended upon whether Mrs. Morton was right or left-handed and whether she held the gun in one hand or the other or in both. The argument of the People that she was left-handed and could not have shot herself, with the bullet ranging to the left, and the argument of the defendant that if she had the gun in her right hand she could have shot herself, with the bullet ranging to the left, assumed that the gun was held in an extreme and unnatural position, with the index finger upon the trigger. The evidence of Mr. Moxley, the unsuccessful attempts of defendant's counsel to illustrate to the jury that the gun could be held and fired in this manner, and the construction of the gun itself, all make it too clearly for argument that it would have been little short of impossible for Mrs. Morton to have held the gun with the safety bar depressed and to have operated the 11½ pound trigger with the index finger. But she would have experienced no difficulty whatever in holding the gun four inches from her body, while she pulled the trigger with the thumb. Defendant was not questioned as to the position of Mrs. Morton's fingers or thumbs with relation to the trigger, and his illustrations to the jury evidently did not cover that detail. In view of defendant's insistence that the trigger was pulled by Mrs. Morton with the index finger, in spite of the expert testimony that it could have been pulled only with the thumb, it would have been somewhat difficult for the jury to have found that Mrs. Morton fired the shot.

The fact that the gun was a least four inches from Mrs. Morton's body leads to conflicting surmises. The first one points toward suicide. All the evidence on the point indicates that Mrs. Morton was standing upright at the time she was shot. There were no powder burns upon her hands or sleeves and nothing to indicate that she had grasped or attempted to grasp the gun. It could be argued, with some force, that defendant would not have held the gun where his wife could easily have knocked it aside or grasped it, and that it was improbable that she would have stood facing him without making some effort to protect herself or escape. It is, of course, not impossible that defendant confronted his wife with the gun suddenly and fired before she had time to move, or that she stood still, with the gun pointed at her heart, in the belief that defendant would not fire it. In opposition to the above indication toward suicide, it might be

argued that Mrs. Morton would have placed the gun against her body to steady it as she fired the shot. We have italicized defendant's testimony that his wife seemed temporarily paralyzed in the position in which she held the gun, for the reason that it seems to portray an actual occurrence. It appears to us unlikely that this detail of evidence would have been invented by defendant because of any tendency it might have to strengthen his testimony on the point. But if the effect of the shot was to temporarily ''paralyze'' Mrs. Morton, this would not tend to prove that she fired it. The evidence as to the position in which the gun was held at the time the shot was fired does not, as defendant contends, support only the theory of suicide. It is not inconsistent with that theory, but it does not exclude the possibility that the gun was fired by defendant. The weight of the conflicting probabilities was for the jury to determine.

The circumstantial evidence that remains for consideration goes to the question of motive. The evidence indicates that Mrs. Morton was grieving over the threatened breaking up of an illicit relationship with one Dallimore, a fellow employee, who was a married man. At the same time it is argued that she was jealous of defendant's former wife. Our attention is called to the testimony of Mrs. Fogelsong that Mrs. Morton was on the front porch weeping shortly before the shooting, and to the fact that when she entered the house she broke the glass in the door when she found it was locked, and stress is laid upon the disturbed condition of her mind which is indicated by these events. It is contended by the People that defendant was jealous of Dallimore, that he became enraged when Mrs. Morton placed all her clothes in the car, preparing to leave, and that he killed her when it appeared that he was about to lose her.

After Mrs. Morton's death, a locker which she maintained at her place of employment was entered and numerous letters were found which she had received from Dallimore, written from Camp Roberts, where he was stationed after his induction into the Army. Also in the locker were found several letters which Mrs. Morton had written to Dallimore, one of which was sealed, stamped and addressed to him. This correspondence proved the existence of an illicit love affair and sexual relations. In a letter from Dallimore, dated July 30, 1945, Dallimore stated that he had been corresponding with his wife and that he had decided to return to her,

although still protesting his love for Mrs. Morton. If this had been the last letter between the two, defendant's argument that Mrs. Morton was despondent would have carried greater weight. But later letters disclosed that Dallimore and Mrs. Morton had been together on a certain Saturday night and had plans for future meetings. The later letters were no less fervent than the former ones. They all gave assurance of a continuance of the relationship. The further argument is made that Mrs. Morton was despondent over the fear that defendant would return to his former wife, and that she was not satisfied with his assurances that he would not do so. Defendant's testimony was that Eliza Jane was 65 years old. The argument that Mrs. Morton feared that defendant would leave her to return to his first wife has support only in the testimony of defendant. A mutual friend, Mrs. Cumbo, stated that some two years before, Mrs. Morton had stated that she was jealous, but that she stated several months before her death that she was no longer jealous of Eliza Jane. There were statements in Mrs. Morton's letters to Dallimore that she was having trouble with her husband and was unhappy over being married to him. In an undated letter, which appears to have been written after their Saturday night meeting previously mentioned, she wrote: ''Walter Daddy I want you so much as my own. I am afraid that sometime I will loose you. If that should ever happn then I don't have anything to live for, Darling you mean every thing in the world to me. I am so mixed up I don't know what to do I love you better than my own life and yet I am married to him and don't love him and you are also married, so Darling if you have any idea as to what I should do let me know.'' In another letter, dated August 2, 1945, she wrote to Dallimore as follows: ''Hello Walter Darling how is my Daddy fine I hope. Well this leaves me not feeling so good to night, well honey Mot has just told every body we would not work Sunday, I am really glad in a way, for the way things stands to night between me and the old man, I would not be able to work any way. I am going to get me an apartment or a sleeping Room some place tomorrow or the next day. Daddy some times I dont know what in the Hell to do I am so mixed up I dont know heads from tails. I some times wonder if God intended for people to go thru Hell here on Earth I know one thing this is my final Roll, I cant stand any more. As I came to work to night

he met me at the parking lot gate and told me when I come in to night there would be a note but he would not be home. Oh well why should I be telling you all this. So just forget what I have said Darling, for all that matters to me is you precious and nothing else. . . .'' The evidence left little room for doubt that Mrs. Morton had completed her preparations to leave the home at the time the shooting took place. Defendant testified that she was only preparing to take her garments to the cleaners, but they were placed in evidence and were shown to have been freshly laundered. In view of the correspondence between Mrs. Morton and Dallimore, and Mrs. Morton's preparations to leave the home, defendant's contention that she was jealous of his first wife seems somewhat tenuous.

The People, as we say, found a motive for homicide in defendant's alleged jealousy of Dallimore, which, it is contended, had been the source of much trouble in the Morton home. Defendant on the stand denied knowledge of the Dallimore affair and of any jealousy over it, until he was confronted with notes that he had written to his wife. He testified that he had found a fragment of a letter which Mrs. Morton had written, addressed ''Walter Darling,'' the remainder of the letter having been destroyed; that he confronted his wife with it and she had explained that she was only practicing writing, but that he did not believe it and thought there was more to it than that. Soon after this he wrote his wife a note, which was later found among her effects. He said, in part, ''One time loved you better than my own life, but the way you have treated me and the way you conducted yourself has completely changed things. the love you had for me if you ever had any, has been dead a long time—the love I had for you was hard to kill but you know you can kill a cat and it has 9 lives—I have faced many hard and tough propositions in my life but this has been the toughest of all—your secret trips, your phone calls and your airmail letters have fone wonders—they have shown me a true picture of the woman I once loved. You want your sun suit and your darling Walter and now you have both. Hope you and he are both satisfied—I don't want to see the sun suit when I return—and I will not live with a woman that will wear one. Do as you please with it. John. If you decide to leave today leave my gun please.'' Other undated notes from defendant found in Mrs. Morton's effects read

as follows: "As soon as I left to get a paper you left to meet your *Dear*, so here are your duds, goodbye. John. over. 12:30. I am *locking the door*. Don't try to break in. When I come back I will put your things on the porch." The foregoing was written upon an envelope, and with it was the following: "Don't be here when I return. Take your dam duds and go back where you spent the day. I don't mean perhaps. Either you start suit for divorce within the next two days or I will start one. A letter came for you today that make nice reading in court. It will help lift your reputation. Ha Ha. I guess this is another day you spent at Cumbo's. Like hell. Leave my pen and don't touch a dam thing of mine. I did think I would move out and give you this. In fact I rented an apartment in pedro this morning and paid one month rent. Came back to get my clothes, found you gone as usual, *out to meet your lover*. Now I have changed my mind. I am at home and going to stay. It is your move. Now do your damndest but do it quick." On another paper was a floor plan of a house of four rooms, on the reverse side of which was written, "Go on, take Steve or who you wish. I have a woman with plenty money and she loves to [undecipherable] Haw Haw. Get your things and get going. John." Defendant at first denied that in the argument which preceded the shooting there had been a quarrel over Dallimore, but later testified that Mrs. Morton was not satisfied with his assurances that he was not intending to return to his former wife and that he replied that if he did not return to her it would be no worse than her affair with Dallimore. Defendant also testified at the coroner's inquest that in the argument his wife told him that the "Walt" was Walter Dallimore, "a former employee of the National Supply, and at present in the army. Q. Did she say whether or not she was in love with him? A. They had planned to go to Montana; so a part of another letter I found —she was writing a letter to one of her aunts and the letter she didn't mail and in the letter she was figuring on going to Montana. Q. Did you speak of that to her the day you quarreled with her, that she died? A. No. Q. The day that she died what did she say about how much she thought of Walt? A. She denied thinking as much of Walt as she did of me." Defendant also testified at the coroner's inquest, with reference to former quarrels, as follows: "Q. When you talked to her about going away with some other man and

you said to her in substance that you didn't want her or the man to rub it in, did you tell her what would happen to her if she did rub it in? A. I said, 'I am getting along in years and I want to stay out of trouble. I will dodge you, if I know where you are, but don't try to rub it in, I don't know what might happen.' Q. Meaning what? A. Well, there might have been a fight or there might have been a killing if she would take some man and continually try to shove me off of the walk, as the old saying goes, rub it in. I don't think I could have stood it. Q. How many times did you tell her in substance what you have just testified to? A. I wouldn't know. Q. About how many times did you tell her that? A. I would say as many as twice. Q. When was the last? A. I don't remember, maybe the day before. Q. Maybe Sunday? A. Possibly; I don't remember. We argued so much and often I can't place the day and hours.'' From defendant's version of the events which preceded the shooting, it would appear that there was no violent quarreling upon his part and that he expressed no anger or resentment at Mrs. Morton's placing her belongings in the car preparatory to leaving the home. The jury disbelieved this testimony and would have been justified in concluding that there had been a quarrel of serious proportions. This would appear to have been the case whether the death was suicidal or homicidal.

There was evidence that there had been much quarreling earlier in the year 1945. Police officers had been called to the Morton home on February 5, April 20, and April 21. Officer Stone testified that on February 5 defendant and his wife were found quarreling and that he heard defendant say, ''I will kill you or any other son of a bitch if you don't stay away from him.'' On April 20, Mrs. Morton told Officers Stone and Sturdevant, in the presence of defendant, that defendant had threatened to beat her, that she wanted to move out of the house and asked their help while she removed her belongings; that defendant was under the influence of liquor, spoke profanely to his wife and told her that she could get out and stay out; that she took her clothes and the officers followed her while she drove to Redondo Beach. Officer Richardson testified that on April 21, 1945, he and another officer, in response to a radio call, went to Morton's home at about 6:25 p. m. and had a conversation with Mr. and Mrs. Morton; that Mrs. Morton stated that

she wished to take her car, had sent a garage man for it to put a battery in it, and that defendant had run him away. She was crying at the time and stated that she was afraid of defendant; defendant was intoxicated; he stated that he would not harm his wife, that she could stay or go, but that he wouldn't let her have the car; he arose from his chair and told the officers that he had a gun and wasn't afraid to use it; that he had used the gun before and that if he had not wanted the police to come in his house he would have used the gun to keep them out. The officers told Mrs. Morton they could not help her get the car but she might leave with them if she wished. Mrs. Morton picked up some of her clothes but Mr. Morton said she could stay and he would not harm her, and she said that if she could not have her car she would take a chance and stay—that she did not think he would harm her. Defendant testified at the coroner's inquest that some six or seven months previously he had put his wife's clothes out of the house because she had "been on a big drunk and had not come in," and had told her that if she was going to act that way she could "go where she had more interests than she had at home and that she would be more than welcome to go." A Mrs. Collins, a fellow employee of decedent, testified to the latter's staying with her four nights in April, 1945, and that they found a note on Mrs. Morton's car reading: "Nora, meet me at the Workers' Cafe. John." and that they saw defendant at Mrs. Morton's car and he said, "Nora, what are you doing?" and that she said, "I am doing just what you told me to do; I got out," and that defendant then said, "Well, if you know what is good for you, you had better come home tonight to Gates Avenue," and that decedent did return to the home. The testimony of defendant given at the coroner's inquest, at the preliminary examination, and at the trial was in many instances evasive and replete with contradictions of his previous testimony and statements. The jury could have believed that his conflicting statements and testimony as to how the gun was held before or at the time the shot was fired materially affected his credibility, and while his testimony in other respects as to the details of the shooting was consistent, there was ample in his testimony as to related matters to indicate that he had slight regard for the truth.

The circumstantial evidence as a whole is inconclusive as to defendant's guilt. That, however, is beside the

question as to whether there was substantial evidence that Mrs. Morton's death was homicidal. It is not for us to weigh the probabilities, but only to determine whether there was evidence which leads to the conclusion of guilt, without doing violence to reason and logic. We cannot say that such evidence was wanting. It was, as we have said, not impossible that defendant should have advanced the gun to within four inches of his wife's body and to have pulled the trigger while she stood still, unresisting; a motive, and an incentive to violence, could have been detected by the jury in the evidence of defendant's jealousy of Dallimore and in the inference that he resented Mrs. Morton's leaving the home. Defendant's disposition toward violence was to be found in the evidence of his quarrelsome nature when drunk and the vague threats which he had uttered. This evidence of motive, disposition, and opportunity was sufficient, unless overcome, to justify a finding that he fired the fatal shot. The question whether that fact was proved to the exclusion of a reasonable doubt was for the jury to answer. For us to hold otherwise would be to weigh the evidence to an extent which is forbidden by law and by precedent, which limit the jurisdiction of our courts of review.

The court instructed the jury as follows: "In the crime of first degree murder referred to in these instructions, 'intent to kill' must be accompanied by *deliberation* and *premeditation.* The statute does not undertake to measure in units of time the length of the period during which the slayer must deliberate and premeditate or ponder over the killing after he or she has formed the intent to kill. The true test is not the duration of the time but the extent of the reflection. Thoughts may follow each other with great rapidity and cold calculating judgment may be arrived at quickly. It will be for you to say from all the evidence in this case whether or not the defendant first intended to kill Nora Hudson Morton, if you find from the evidence, beyond a reasonable doubt that he did kill her, and then, whether or not having said intent to kill her the intent was accompanied by deliberation and premeditation."

Under the evidence of the People, the charge of first degree murder laid against defendant falls within that class described by section 189 of the Penal Code as "any other kind of willful, deliberate and premeditated killing." An intent to kill must accompany the commission of the fatal

act and it must be an intent formed with deliberation and premeditation. The instruction not only fails to declare that the intent to kill which distinguishes first degree murder from second degree murder is an intent formed after deliberation and premeditation, but in effect it declares that the act of killing may amount to first degree murder even if the intent to kill is formed without deliberation or premeditation. The clear meaning of the first sentence conveyed by the use of the word "accompanied" is that the deliberation and premeditation and the intent to kill may all occur at the same instant, and that deliberation and premeditation need not precede the formation of the intent. This was a complete misstatement of the law of first degree murder, in that it eliminated the single element of the offense which distinguishes it from second degree murder. The instruction is so patently confusing throughout as to require no further comment. It goes without saying that one whose life is in jeopardy under such a prosecution is entitled to have the applicable rules of law stated as clearly and simply as possible and with meticulous accuracy. An infallible guide in the drafting of such instructions will be found in the decisions of the Supreme Court in *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21] ; *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7], and *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]. They provide a pattern for instructions on murder which should be followed by trial courts without deviation or attempted innovation. ■ The confusion engendered by the quoted instruction was not removed, and the error was not rendered harmless, by the giving of another instruction which gave the statutory definitions of the offenses of manslaughter and first and second degree murder. This error alone would justify a reversal of the judgment of guilt of the charge of first degree murder. It does not, however, furnish the only ground of invalidity of the judgment of guilt of that offense.

We now have to consider the further questions whether the evidence was sufficient to sustain a conviction of first degree murder and, if it was insufficient, whether it establishes the guilt of defendant of the offense of second degree murder. ■ It was not enough to justify a verdict of murder in the first degree that defendant *might* have formed an intention to kill his wife after giving the matter deliberate consideration. The evidence of the statements and con-

duct of an accused must be such as to furnish a reasonable basis for the belief that the intent to kill was formed after deliberation and premeditation. ■ The fact may be proved by circumstantial evidence, but it is not established when the evidence proves only the killing and no other act and no statement logically tending to prove a deliberately formed intention to destroy life. Conjecture cannot be allowed to take the place of evidence. ■ We are not unmindful of the evidence that defendant, many months prior to the shooting, uttered veiled threats of what he might do if his wife and a paramour should "try to shove me off of the walk" or "rub it in." But these remote statements, followed by many months of cohabitation, were by no means sufficient to prove that the act of shooting was deliberate or premeditated. Our views of the sufficiency of the evidence may be stated as follows: Considering the relations of the parties, their frequent quarrels, their separations and resumption of marital life, and especially the defendant's attitude on previous occasions when his wife had left him, only to return and to be welcomed home, and the undoubted fact that an extended quarrel took place immediately before the shooting, a conclusion that defendant's act was deliberate and premeditated, rather than impulsive, would be without support in the evidence. The judgment of guilt of first degree murder cannot be allowed to stand consistently with the holdings of the Supreme Court in *People* v. *Holt* and *People* v. *Bender, supra,* and *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385].

■ Defendant advances the further claim that the jury was insufficiently instructed as to the distinction between murder and manslaughter. The court gave the following instruction: "Manslaughter is principally distinguishable from murder in this that though the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice either express or implied which is the very essence of murder is presumed to be wanting, and the act being imputed to the infirmity of human nature the correction ordained for it is proportionately lenient." As a passing observation upon the offenses of manslaughter and murder, the statement is instructive but it declares no rule of law. Defendant says it was the only instruction, except for one which gave the statutory definitions of manslaughter and first and second degree murder, and if that were the case, the complaint of insufficience would have been well founded.

The court, however, gave an instruction as to the circumstances in which a felonious homicide would be reduced from the grade of murder to manslaughter, that is to say, if it occurred upon a sudden quarrel or in heat of passion. The latter term was fully defined and defendant has no criticism of the instruction—in fact, ignores the instruction altogether in his briefs. We are of the opinion that the instructions that were given were sufficient. The issue as between manslaughter and murder was fairly tried. The evidence which we have related furnished ample justification for the jury's determination that defendant was guilty of murder and not manslaughter. Since the jury found, upon sufficient evidence, that the offense was not manslaughter, and there was insufficient evidence to prove murder of the first degree, it necessarily follows that the offense proved was that of murder of the second degree.

The conclusion which we have stated require that the judgment appealed from be modified, and it is modified, by reducing it to murder of the second degree, and as so modified is affirmed. The order denying defendant's motion for a new trial is also affirmed. The cause is remanded to the superior court, with directions to pronounce judgment upon defendant sentencing him to be imprisoned in the state prison for the term prescribed by law for murder of the second degree. (*People* v. *Holt, supra.*)

Wood, J., and Kincaid, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1947.