[Crim. No. 19. Fourth Appellate District.—March 27, 1930.]

THE PEOPLE, Respondent, v. WILLIE WEEKS, Appellant.

Calvin H. Conron, Jr., and Frederick E. Hoar for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

MARKS, Acting P. J.—Appellant was charged with the crime of murder in the first degree alleged to have been committed on the fifth day of October, 1929, in the county of Kern, state of California. He was charged with killing Isaac Ross, and went to trial upon his plea of not guilty. The jury returned a verdict finding him guilty as charged and fixed his punishment at confinement for life in the state penitentiary.

The evidence offered by the People shows that defendant and his family, consisting of himself, his wife and her brother, lived in a shack a short distance from the city of Bakersfield in Kern County. On the night of October 5, 1929, defendant, who was colored, with J. I. Fuller, Henry C. Lorendo and another white man, were engaged in playing a game of stud poker at Weeks' residence. Shortly after midnight another party arrived at the house. It was composed of Maceo Daniels, Arthur Humphreys and his wife, Walter Brite and a man named White. After the arrival of this party Joe Johnson and Isaac Ross reached the house. Both of these parties were colored.

Of the first party Daniels, Humphreys and Brite entered Weeks' home and the first two joined the poker game, taking the place of two of the white men. Of the second party Ross alone entered the house.

Shortly after Daniels and Humphreys started to play poker a controversy arose between them, and, as all of the witnesses for the People testified, defendant started cursing the other two negroes, calling them vile and indecent names. Daniels tried to quiet Weeks, but, as he was unable to do so, he and Humphreys cashed in their checks and left the game. They passed into the front room of the house, Daniels going out the front door. Weeks also went into the front room and demanded that Humphreys pay him three dollars which he claims was owing him. Weeks armed himself with a shotgun and told Humphreys that if he did not pay him the money he would blow his head off. Humphreys pleaded for his life and told Weeks that he did not have the money, but would get it for him. Weeks continued to curse and threaten Humphreys, who then called upon his friend Daniels for aid. Daniels re-entered the room and Weeks turned the shotgun on him. Daniels told Weeks that he should not kill a boy for three dollars, and continuing

to talk to him, advanced until he was close enough to grasp the barrel of the shotgun and force the muzzle down to the floor. He and Weeks struggled for the possession of the gun, and in the struggle Weeks was shoved backwards toward the kitchen, where he grasped a butcher knife and drawing it back, threatened to kill Daniels with it. Humphreys ran from the room and house and was followed by Daniels and Ross. Just where Ross had been during the altercation is not entirely clear, but the three men left the room and house in the order named. Just after Ross had disappeared through the front door Weeks fired the shotgun through a screen and canvas covered opening in the front wall of the house and slightly to the left of the front door through which the three men had disappeared, the charge of shot from the gun striking Ross and penetrating his back, hip and thigh, causing his death within a short time.

The evidence for the defendant presents the defense of accidental homicide. He testified that when Daniels and Humphreys joined the poker game they were boisterous and used vile and profane language in the hearing of his wife. He remonstrated with them, and according to his version, Daniels made an assault upon him with a knife. Defendant armed himself with the shotgun against the murderous assault by Daniels. He and Daniels struggled for the possession of the gun and during the struggle it was unintentionally discharged, the shots passing through the window and hitting Ross. The testimony of both Weeks and his wife, who corroborated this story told by Weeks, was rather thoroughly impeached by contradictory statements made by them the day after the homicide.

Defendant presents but two points on this appeal. He maintains that the evidence was insufficient to justify the verdict of the jury finding the defendant guilty of murder in the first degree, and that at most it could only support a conviction of murder in the second degree. He also complains of remarks and statements of the trial judge made in the presence of the jury which he maintains constituted prejudicial error.

We cannot agree with appellant that the evidence did not justify the verdict of the jury according to the testimony of the witnesses for the People, and, in fact, by

the almost undisputed evidence in the case according to the testimony of a number of witnesses. Defendant applied the vilest of epithets to both Humphreys and Daniels, and when they sought to retire from the imminent danger of an attack by him, he detained Humphreys at the muzzle of a loaded shotgun, with threats to blow his head off if he did not pay him three dollars. When Daniels interfered and attempted to prevent the murder of his friend, Weeks armed himself with a knife, in addition to the shotgun, and attempted a murderous assault upon Daniels. Daniels and Humphreys sought escape from the attack in flight and were followed from the house by deceased. Weeks, apparently intent upon carrying out his threats to take the life of either Humphreys or Daniels fired through a window in the general direction that the fleeing men had taken. He did not hit his antagonists, but killed his friend.

Murder is the unlawful killing of a human being with malice aforethought. The malice may be express or implied. It is express when there is manifest a deliberate intention to unlawfully take the life of a human being.

The intent must exist in the mind of the killer, but there is no need for an appreciable length of time to elapse between the formation of the intent and the execution of the act. The act may follow the intent as rapidly as thought may pass through the mind, and if the intent be followed by an act which results in the taking of human life with malice aforethought, it is murder in the first degree. (*People* v. *Mendenhall*, 135 Cal. 344 [67 Pac. 325].) In the case before us we have all the elements of this crime. The malice was express, also the intent to take life, and because the defendant, in carrying out his threats and his felonious intent, took the life of his friend rather than the life of his supposed enemy, cannot excuse his act or reduce the degree of his crime.

Appellant complains of remarks of the trial judge in the presence and hearing of the jury. The only such remarks to which an objection was noted by him occurred during the following colloquy:

"Mr. Bailey: I will call your attention—

"Mr. Hoar (Interrupting): Now, Your Honor, at this time we object to any reference to any diagram to be shown this witness on the ground that the proper foundation has

not been laid, and possibly I can ask that witness one question that will lay the foundation.

"Mr Hoar: Q. You were not present at the time the homicide was committed, were you, were you? A. No sir.

"Q. And you made your diagram just a little over a week ago? A. Last Saturday.

"Q. Are you able to state to the court of your own knowledge that the house was in the same condition last Saturday as it was the time the homicide was committed?

"Mr. Bailey: I didn't ask the witness to produce anything yet.

"The Court: No, this is not the time to make any objection. In the first place whether this is in the same condition or whether it is not; I assume the highway is still out there that was there and things like that; he has made a chart; if it is not correct you can show that it is not, but don't start objecting so early.

"Mr. Hoar: Now if your Honor please, I take exception to your Honor's remarks, the law gives us a right to object whenever we want to.

"The Court: Well, I have overruled the objection.

"Mr. Hoar: That is all right.

"The Court: You can just get out of the habit of arguing with me every time I make a ruling, because my ruling is binding on everybody, and we are not going to take up a lot of time arguing about these matters. When we come to a question where there is a vital question asked, then we will have a ruling on it; he has made a map here, and if it is not right you have a chance to show that it is not right.

"Mr. Hoar: I thought Your Honor did make the statement that we were not to make objections so early."

We do not believe that these remarks were sufficient to prejudice the case of appellant before the jury.

█ It is the well-settled law in this state that the claim of misconduct on the part of the trial judge, under ordinary conditions, will not be considered on appeal, unless the party relying on the alleged misconduct promptly called the attention of the court to the purported impropriety and assigned misconduct thereon. This is to give the judge an opportunity to correct the error, if any, and prevent any prejudice resulting therefrom by promptly instruct-

ing the jury to disregard the statements made (*People* v. *MacDonald,* 167 Cal. 545 [140 Pac. 256]). It is also the rule that where the error of the court was so serious that no successful effort could be made to remove its prejudicial effect, an exception and assignment of the remarks as error would not be necessary (*People* v. *Mahoney,* 201 Cal. 618 [258 Pac. 607]).

 The record before us shows that things were said during the trial which might have been omitted. (*People* v. *Osborn,* 12 Cal. App. 148 [106 Pac. 891].) Most of them occurred during the court's numerous efforts to speed up the trial, which was unduly protracted by counsel for appellant. In their cross-examination of witnesses they repeatedly went over the same ground, until, instead of making progress with the case, they were only marking time. Under such trying circumstances a trial judge should extend his patience to the limit in presiding at the trial. After reading the entire record of the long trial, we are satisfied that remarks of the trial judge did not result either in prejudice to the defendant or in a miscarriage of justice. The evidence showed that the defendant was guilty of murder in the first degree. The verdict was the most favorable to him that could be expected. The jury did not exact the extreme penalty for the crime which it might have done under all of the circumstances of the case. When measured by the final results, as disclosed by the verdict, the defendant was not prejudiced by any action of either the court or counsel during the trial.

 The defendant having failed to assign the remarks of the trial court as error, and these remarks not having been of such a nature that their prejudicial effect, if any, could not have been cured by prompt instructions to the jury to disregard them, we must follow the well-settled rule that we will not review them here. (*People* v. *MacDonald, supra; People* v. *Marsiglia,* 52 Cal. App. 385 [198 Pac. 1007]; *People* v. *Walker,* 15 Cal. App. 400 [114 Pac. 1009].)

Judgment affirmed.

Barnard, J., and Strother, J., *pro tem.,* concurred.