[Crim. No. 3968.   Second Dist., Div. Three.   Feb. 8, 1946.]

THE PEOPLE, Respondent, v. CHARLES E. ENDNER, Appellant.

Maurice A. Gleason for Appellant.

Robert W. Kenny, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

SHINN, J. — Defendant, accused of the murder of his mother, Martha Ella Endner, was convicted in a trial by the court, the crime was found to be murder of the second degree, and defendant was sentenced to state prison.   After the denial of his motion for a new trial, he appealed from the order and from the judgment.   His sole contention on the appeal is that the evidence failed to show that Mrs. Endner's death was the result of a criminal agency.

Defendant and his mother had lived together for some 25 years; he had cared for his mother and, with some help from a brother and a sister, had supported her. During this interval defendant married and for a number of years his wife lived with them, but at the time of the mother's death and for some time prior thereto no one else was living in the house. Mrs. Endner was 83 years of age, partially deaf and blind, feeble in health, had much difficulty getting around with the aid of a cane, and weighed about 120 pounds. Defendant was steadily employed by a creamery company. The two lived in a small house adjoining the home of Mr. and Mrs. Whitaker to the west and that of Mr. and Mrs. McChesney to the east.

On the evening of May 4, 1945, defendant returned home from work, prepared dinner, and left the house, returning about 2:30 a. m. in a state of intoxication. At about that time the Whitakers and the McChesneys were aroused by the loud screaming of Mrs. Endner and the cursing of defendant. The testimony of these four persons, who were witnesses for the prosecution, was, in brief, as follows: Mrs. Whitaker arose from bed, put on a gown and slippers and went to her kitchen, the east window of which was some 17 or 18 feet from the window of Mrs. Endner's bedroom. The Whitaker kitchen remained unlighted; Mrs. Endner's room was lighted and the shades were up. Mrs. Whitaker stood in the kitchen and saw defendant striking his mother and then passed from her kitchen into the yard, slamming the door in the hope that it would cause defendant to desist. She stood at the side of her house some 3 feet from the Endners' window and called to defendant to cease striking his mother but he paid no attention to her. She returned to the kitchen, as her husband arrived, and the two watched the Endners for another 10 minutes. Mrs. Whitaker became ill and retired but Mr. Whitaker remained in the kitchen for approximately an hour, and until the police came. Mrs. Whitaker saw defendant strike his mother on the chest and knock her to the floor, pick her up and throw her heavily on the bed. She saw defendant strike his mother many times, holding a towel wadded up to about 8 inches in size. The blows were administered both before and after Mrs. Endner was thrown onto the bed. Defendant was cursing his mother loudly and she was crying for help. Defendant was ''cursing and asking her if she was never going to die; was she going to live forever,

and he included—was using terrible language along with it.'' Defendant called his mother foul names, which were stated by the witness. She had heard commotions in the Endner household at least once a week and had lived next door for more than a year and a half; she had seen defendant strike his mother many times, the last previous occasion being about three days prior to May 5; he would use a rag of some kind and at other times would hit her with his fist. On a previous occasion he had said to her, ''Aren't you ever going to die? Am I going to have to tap you on the head with a hammer and get rid of you?'' Mr. Whitaker testified that defendant was striking his mother in the morning of May 5th with what looked like a towel ''wrapped up, doubled up''; that defendant left the room, appeared to be telephoning, and returned and continued to strike his mother as she lay in bed, and that it appeared that he was hitting her with his fist around the head and shoulders, and he heard defendant say, ''Aren't you ever going to die, you old ——? You are my mother but I hate you.'' The mother continued to scream loudly. He had seen defendant strike his mother before; within two weeks prior to May 5 he had seen Mrs. Endner on the bed with her hands tied to the bedpost and defendant slapping her in the face with a towel. Mrs. Endner was screaming and Mr. Whitaker called the police.

Mr. and Mrs. McChesney were aroused from bed in the early morning of May 5 by the screaming of Mrs. Endner and defendant's cursing. Mrs. McChesney testified that she heard defendant say, ''Aren't you ever going to die? I got rid of one of you last year and I will get rid of you this year.'' She had heard such noises come from the Endner house at least as often as once a week. Mr. McChesney gave testimony substantially the same as that of his wife. He heard defendant say, ''This God damn house depresses me. When I get rid of you I will be happy.'' The McChesneys could not see what was going on in the Endner house. They had heard similar screaming and profanity in the Endner house on many occasions.

About 4 o'clock in the morning the police came. They entered the house,—saw Mrs. Endner lying in bed, and one of the officers testified, ''She was drooling at the mouth, and the left side of her lip was lower than the rest.'' Defendant said she had had a stroke and the police left, but returned after talking with the neighbors and sent for an ambulance, which

took Mrs. Endner to the receiving hospital, where she died three days later. The officers testified that defendant was intoxicated but that he conversed with them freely.

Defendant testified that he was drunk when he came home the morning of May 5; that he found the lights on in the house and his mother upon the floor; that he picked her up, placed her upon the bed, and telephoned to his sister; that he "blacked out" shortly thereafter and remembered only vaguely the arrival of the police and other events; that he could not remember striking his mother and that if he had cursed and made the statements testified to by the witnesses he must have been out of his head.

The contention that death was not shown to have resulted from the administration of physical violence by defendant is founded upon what are claimed to be contradictions in the testimony given by Dr. Webb, who performed the autopsy, and Dr. Neilsen, who made an examination of the brain of decedent. Dr. Webb testified that he found multiple bruises upon the body, on the shins, the buttocks, chest, face and head, none of them defined in a manner which would have indicated the agency which caused the bruises. The bruises on the head, one of which was on the left temple, corresponded with inner hemorrhagic areas. Within the skull he found a subdural hemorrhage, a blood clot a quarter of an inch thick beneath the bruise on the left temple. The clot was in the dura mater between the brain proper and its covering. His findings were that there was concussion of the brain and that death resulted from traumatic injury which caused the formation of the blood clot from the source of blood supply of the dura mater outside the brain. He removed the brain from the skull, placed it in formaldehyde and it was taken to Dr. Neilsen for examination. Dr. Webb testified that most of the blood clot remained in the skull, and that the greater part of it which was removed was washed away in the solution. Dr. Neilsen was called by defendant. He testified that he examined the brain, especially for trauma, and found none, nor any injury to the brain. He expressed the opinion that a blood clot in the dura mater would not cause death unless it was of such proportions as to cause distortion of the brain, and he testified that he found no such distortion. But this opinion had the qualification that the subject was "otherwise healthy," and the witness stated: "But there is another point here that I did not have knowl-

edge of, and that is the details of that assumed subdural hemorrhage, because that was, in all probability, from a vein and not from an artery. I understand that somebody else did a part of the autopsy. Whatever that doctor found would be valuable in arriving at this conclusion." The conclusion referred to evidently was as to the cause of death, Dr. Neilsen having testified that he had formed no opinion in that matter.

Dr. Webb, when questioned on the subject, found no contradiction in the testimony of Dr. Neilsen with his own, nor do we understand that there was such a conflict. Even if there were, it was within the province of the trial court to give full credit to the testimony of Dr. Webb, and this testimony was clearly sufficient to prove that death resulted from a blow on the head of decedent. The evidence was sufficient to prove that Mrs. Endner died as a result of physical violence exerted by defendant.

■ Murder is the unlawful killing of a human being with malice aforethought. Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, §§ 187, 188.) The evidence was sufficient to prove defendant to have been of abandoned and malignant heart throughout a long course of physical abuse of his mother, and from this fact malice will be implied. Mrs. Endner's body had many bruises and one blow was severe enough to cause death. She was old, frail, infirm, and with a precarious hold upon life. ■ Defendant was not too drunk to know what he was doing. He testified that he suffered a "black out" after he had placed his mother upon the bed, but he also gave this as an excuse for not visiting his mother at the hospital during her lifetime, although he testified that the continuous "black out," from which he claimed to have been suffering, was not caused by drink. Defendant telephoned to his sister during the course of his mistreatment of his mother and, as we say, talked freely with the officers. After a full consideration of the evidence, we are of the opinion that the court was justified in concluding that it was defendant's deliberate intention to bring about the death of his mother by means of a course of violent mistreatment.

The judgment and order denying motion for new trial are affirmed.

Desmond, P. J., and Wood, J., concurred.