[Crim. No. 5859.  Second Dist., Div. Three.  Oct. 10, 1957.]

THE PEOPLE, Plaintiff and Appellant, v. RICHARD GILBERT McAULIFFE, Defendant and Appellant.

334

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Herbert C. Grundell, District Attorney (San Luis Obispo), and W. R. Fredman, Deputy District Attorney, for Plaintiff and Appellant.

Stanley T. Tomlinson and Chas. H. Lynch for Defendant and Appellant.

VALLÉE, J.—Defendant was charged with the murder of his uncle, John Thomas McAuliffe. He was tried by a jury which found he was guilty of first degree murder and fixed the penalty as life imprisonment. Defendant moved for a new trial and for reduction of the degree of the offense in accord with section 1181, subdivision 6, of the Penal Code. The court reduced the degree of the offense to second degree murder and denied the motion for a new trial. Defendant appeals from the judgment and the order denying his motion for a new trial. The People appeal from the order reducing the degree of the offense to second degree murder.

### Defendants' Appeal

Defendant first claims the evidence is insufficient to support the finding that he was guilty of second degree murder, and that as a matter of law the homicide was justifiable: it was committed in self-defense.

The principal characters were John Thomas "Jack" McAuliffe, the deceased; defendant Richard Gilbert McAuliffe; John Charles McAuliffe, defendant's brother; Virginia McAuliffe, wife of the deceased; and Susan McAuliffe, daughter of Virginia.

On August 8, 1956 defendant and his brother John drove from San Diego to Cayucos in San Luis Obispo County in John's pickup truck to visit with their uncle, Jack, at the latter's ranch during deer season. Defendant lived in El Cajon near San Diego. During the days following, they assisted Jack around the ranch and hunted with him. Their relations were amicable.

On August 13 defendant and Virginia went to San Luis Obispo. On the return trip they stopped at several bars, con-

sumed beer, and Virginia bought a jug of wine. When they arrived at the ranch Virginia drank some of the wine, "she was really putting it down." Jack raised "the devil about it," "jumped" on defendant and accused him of buying the wine for her. Defendant told Jack all he bought her was a couple of bottles of beer, that she got the wine herself; Jack "just snorted," and walked away. John took Jack's side in the argument. That night defendant slept in the same room with his brother, John.

The next morning, August 14, 1956, Jack left early to go to Minetti's ranch to help with the harvesting. Later defendant and his brother, John, went to Cayucos. They spent the afternoon playing pool and drinking beer, wagering a drink of beer on the outcome of each game of pool. A dispute arose between them—John claimed defendant owed him a glass of beer; defendant claimed he did not. Defendant bought a glass of beer for himself, took one sip, and left for the restroom. While he was gone John drank defendant's glass of beer, left the saloon, and concealed himself in an adjoining building. When defendant returned from the restroom he asked who had drunk his beer. He was told his brother had. Defendant then became "pretty ornery," said "I'm going to get that dirty so-and-so," and left the saloon. Defendant looked for John but did not find him. He then got a piece of 2-inch pipe about 18 inches long, went to John's pickup truck, said, "Well, I'll fix him. I'll bust his ignition switch, where he'll have to walk," and hit the ignition switch with the pipe. John saw what was going on, shouted to defendant to stop or he would have him arrested. As John approached, defendant swung the pipe at his head. A scuffle took place. John testified that during the scuffle defendant told him "he was going to get both of us; he said we thought we were pretty smart S-B's, that he was going to get both of us before 12 o'clock." A bystander testified he heard defendant say "he'd have him [John] under the sod, before the night was over." A peacemaker quieted the brothers and offered to buy each a beer. They went to a saloon and had a beer. The bystander suggested the brothers shake hands. John was willing but defendant refused. About 5:30 p.m. John said to defendant, "If you're not ready to go back to the ranch by 6 o'clock, I'm going to go off without you." John then left the saloon.

John left Cayucos alone in his pickup truck about 6 p.m. Defendant stayed in the saloon and when the bartender refused to serve him more beer he left and went to another. On

John's return to the ranch he, Virginia, and Susan drove to the ranch where Jack was working. There John remarked to Minetti, "Richard threatened to kill him in El Cajon. He threatened me today. The third time he'll probably get me." The women returned to the McAuliffe ranch and hid two rifles belonging to the brothers. Another rifle belonging to Jack was in a corner of the kitchen. The women did not hide Jack's rifle. Jack and John returned to the McAuliffe ranch about 8:30 p.m. After supper they went upstairs to work on a new cartridge reloading machine. The machine was in an unused bedroom on the second floor.

Defendant left Cayucos about 7 p. m. and walked 7 miles to the ranch. On the way he was "pretty ornery" and "cussed his brother out." When he arrived at the ranch he stopped at John's pickup truck and slammed the door. John heard the door slam; Jack said, "See who that is"; John opened the window, saw it was defendant, and said in a loud voice, "Get the hell away from the truck." As defendant approached the house he called out, "You S-B's have had it."

Virginia and Susan were in the living room. It was about 10:30. On hearing defendant approach the house, Susan went upstairs and told Jack and John defendant had arrived. Defendant entered the house through the kitchen and walked into the living room. As he did so he said to Virginia, "You dirty so-and-so's, what did you take the pick-up and make me walk seven miles home?" John testified he heard defendant say this. In the living room defendant looked toward the place where his rifle was usually kept. Not finding it, he walked back to the kitchen. After wandering around several minutes he picked up Jack's rifle, pumped it, forcing a shell into firing position. Virginia told him he had better put the gun down. He told her to mind her own business. Defendant walked out the back door and started up the stairs to the second floor, followed by the two women. As he started up the stairs Virginia shouted to Jack and John to watch out, that he was coming up with a gun. Defendant told her to shut up or he would shoot. As he neared the top of the stairs defendant said, "You wise S-B's think you're pretty smart. You stole my pick-up and my rifle, and you let me walk seven miles from the town."

Jack and John were in the loading room with the door closed. They heard what defendant said. Jack was 6 feet 2 inches tall and weighed 263 pounds. Jack told John to step back of the door, said "I'm going to ask him to leave," that he didn't want any drinking there and was going to ask him

to take his gear and leave, "head off down the road." John said, "Well, let me talk to him." Jack replied in a loud voice, "No, if he gets smart, I want first swing at him." Susan testified she heard Jack say, "Let me have the first swing at him." John went behind the door. Jack went out of the door at a quick pace into a hallway leading to the stairs, with his hand raised. He was not armed. It was 11 feet 6 inches from the door to the top of the stairs. As Jack approached the stairs defendant fired. The shot was fatal. The bullet entered the mid-portion of the chest, hit the breast bone, went through the base of the heart just below the breast bone, went through the vertebrae, and wound up underneath the skin in the upper lumbar area of the back. After the shooting Jack was lying in the hall with his head near the top of the stairs. Virginia testified she did not hear any voices upstairs before the sound of the shot. Defendant went down the stairs and said to Virginia, "Call the sheriff. I shot the S-B. Tell him to come and get me." Defendant was arrested a short distance down the road from the house about 11:25 p. m. He was sober.

Defendant's version of the events prior to his return to the ranch on the night of the shooting conformed generally to the evidence of the People. He testified that after the dispute in the saloon at Cayucos he was "pretty mad," "got pretty ornery," and went looking for John; John pulled a knife in the scuffle at the pickup truck; he said to John, "You cut me with that knife, you won't live to tell about it." He denied otherwise threatening Jack or John. He thought the rifle he picked up in the kitchen was his and he was going up to bed. He clicked the loading mechanism to assure himself a shell was not in the chamber. As he was going up the stairs, Virginia yelled, "Look out! Dick's coming upstairs, and he's got a gun." He said, "Shut up! I'm not going to shoot anybody. I'm just going up and go to bed." He walked on up the stairs, heard a shuffling of feet, heard a door open, turned around, and there was his uncle coming out the door with his hands behind him. His uncle closed the door and yelled, "I'll kill you, you lousy bastard." He levered a shell into the chamber of the rifle. His uncle came charging at him with his right hand swinging. He knew his uncle was very violent, and thought he saw a knife in his left hand and that he was going to kill him; he levered a shell into the chamber; aimed the gun at his uncle's legs; yelled, "Halt! Stop!" Jack kept coming; he jumped back and pulled the trigger.

Shortly after his arrest defendant told an assistant district attorney he was sore at John and not at Jack; that Jack's hands were at his sides, not behind his back; and he did not notice whether Jack had anything in his hands or not. About three hours after the shooting defendant told a newspaper reporter he carried Jack's gun upstairs to put it away in Jack's room. About two hours later defendant told a deputy sheriff he was sober after walking seven miles from Cayucos to the ranch. In none of these conversations did defendant mention that he thought Jack had a knife in his hand.

Murder is the unlawful killing of a human being, with malice aforethought. (Pen. Code, § 187.) "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.) "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree." (Pen. Code, § 189.)

■ "Murder of the second degree: a willful act characterized by the presence of malice aforethought and, at least ordinarily, by the specific intent to kill, and by the absence of premeditation and deliberation." (*People* v. *Bender*, 27 Cal. 2d 164, 181-182 [163 P.2d 8].)

■ "When an unlawful assault is made with a deadly weapon upon the person of another, resulting in death, and the assault is not provoked or perpetrated in necessary self-defense, or in the heat of passion, malice may be presumed. Under such circumstances, the killing may constitute murder of the second degree when it is not perpetrated by means of poison, lying in wait, torture or any other kind of wilful, deliberate or premeditated killing." (*People* v. *Butterfield*, 40 Cal.App.2d 725, 729 [105 P.2d 628].)

There was ample evidence that defendant was not intoxicated and that he was capable of forming the required intent. It may fairly be inferred from the evidence that the killing did not occur as a result of any deliberation or premeditation. The trial judge in reducing the degree of the offense said: "After a careful review and consideration of all the evidence

adduced at the trial and the circumstances surrounding the killing, I do not feel an abiding conviction, nor can I conscientiously say, that the evidence presented was substantial enough or legally sufficient to support the verdict and finding of the jury of first degree murder under recent California Supreme and Appellate Court decisions strictly defining deliberation and premeditation required to make a killing murder of the first degree." It is not for this court to weigh the probabilities. Our only function is to determine whether there is evidence which leads to the conclusion of guilt of second degree murder without doing violence to reason and logic. (*People* v. *Morton,* 79 Cal.App.2d 828, 842 [181 P.2d 32].) The evidence clearly warranted a conviction of second degree murder. (*People* v. *Mendes,* 35 Cal.2d 537 [219 P.2d 1]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Jones,* 136 Cal. App.2d 175 [288 P.2d 544]; *People* v. *Endner,* 73 Cal.App.2d 20 [165 P.2d 712]; *People* v. *Efstathiou,* 47 Cal.App.2d 441 [118 P.2d 22]; *People* v. *Buenaflore,* 40 Cal.App.2d 713 [105 P.2d 621]; *People* v. *Butterfield,* 40 Cal.App.2d 725 [105 P.2d 628]. Also see *People* v. *Sheran,* 49 Cal.2d 101 [315 P.2d 5].)

It is argued that parts of the testimony of John McAuliffe are not worthy of credence, that there are inconsistencies in his testimony and between the testimony of various witnesses, that there are conflicts between the testimony of John and the testimony of other witnesses. These matters were the concern of the jury and of the trial court on hearing the motions for a new trial and for reduction of the degree of the offense. No matter how inconsistent the testimony of a witness or of two or more witnesses may be, a reviewing court cannot reject the testimony. (*People* v. *Mooney,* 177 Cal. 642, 650 [171 P. 690].)

A homicide is justifiable "2. When committed in defense of . . . person, against one who manifestly intends or endeavors by violence or surprise, to commit a felony . . . or, 3. When committed in the lawful defense of such person . . . when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed." (Pen. Code,

§ 197.) "A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (Pen. Code, § 198.)

"'If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self defense. "A man has not . . . the right to provoke a quarrel and take advantage of it, and then justify the homicide." Self-defense may be resorted to in order to repel force, but not to inflict vengeance. . . . "There is certainly no law to justify the proposition that a man may be the assailant and bring on an attack, and then claim exemption from the consequence of killing his adversary on the ground of self defense."'" (*People* v. *Holt*, 25 Cal.2d 59, 66 [153 P.2d 21].)

Defendant's contention that the evidence shows as a matter of law that the homicide was justifiable, committed in self-defense, is predicated largely on his own testimony. The jury was not required to accept defendant's version of the killing. (*People* v. *Zilbauer*, 44 Cal.2d 43, 48-49 [279 P.2d 534]; *People* v. *Eggers*, 30 Cal.2d 676, 686 [185 P.2d 1]; *People* v. *Fitch*, 28 Cal.App.2d 31, 38 [81 P.2d 1019].)

Whether defendant, as a reasonable man, was justified in believing, under the facts, that he was threatened with imminent danger so as to justify the use of a deadly weapon in necessary self-defense was a question of fact for the jury. With its conclusion we may not interfere. (*People* v. *Torres*, 94 Cal.App.2d 146, 149 [210 P.2d 324]; *People* v. *Gallow*, 106 Cal.App.2d 647, 649 [235 P.2d 660]; 25 Cal.Jur.2d 817, § 825.) We cannot say, as a matter of law, that defendant acted in self-defense.

The theory of the People at the trial apparently was that defendant intended to kill his brother John and that when he reached the top of the stairs and met his uncle, Jack, he transferred his intent to his uncle. Accordingly, the People proffered and the court gave this instruction:

"If you find from the evidence that the defendant, RICHARD GILBERT McAULIFFE, deliberately and premeditately [sic] intended to wilfully, unlawfully, and with malice aforethought kill and murder his brother, JOHN CHARLES McAULIFFE, or any other human being, and that in making such unlawful

attempt to take the life of his brother, JOHN CHARLES MC-AULIFFE, or any other person, the defendant, RICHARD GILBERT McAULIFFE, intentionally killed his uncle, JOHN THOMAS 'JACK' McAULIFFE, then the defendant, RICHARD GILBERT McAULIFFE, is, under such circumstances, just as guilty of the crime of murder and of the same grade of offense as if he had unlawfully, deliberately, and premeditately [sic] and with malice aforethought, killed his brother, JOHN CHARLES McAULIFFE, or the person whom he intended to kill instead of his uncle, JOHN THOMAS 'JACK' McAULIFFE. Under such circumstances the crime is as complete as though the person against whom the intent to kill was directed had been in fact killed.

"If you should find that RICHARD GILBERT McAULIFFE killed his uncle, JOHN THOMAS 'JACK' McAULIFFE, when his uncle was placing himself between RICHARD GILBERT McAULIFFE and the object of his vengeance, you are advised that the law holds the assailant responsible for his felonious intent, merely transferring its direction from the original object of the attempt to the person killed. The degree of guilt is the same as it would have been if the attempt had resulted in the death of the person at whom it was aimed."

Defendant asserts it was error to give this instruction. He says the first paragraph fails to advise the jury to take into consideration the evidence relating to self-defense or other circumstances of mitigation; that it assumes defendant unlawfully attempted to take the life of his brother; and that it ignores the elements of all the lesser included degrees of homicide, and emphasizes the elements of first degree murder. He says the second paragraph is based on the unwarranted assumption that Jack "was placing himself between [defendant] and the object of his vengeance," and advised the jury that if defendant killed Jack under such circumstances the law holds him responsible for his felonious intent, merely transferring its direction from the original object of the attempt to the person killed.

The instruction complained of was immediately preceded by this one:

"Where a person with malice aforethought attempts to unlawfully kill a certain other person, but, by mistake or inadvertance [sic], in such attempt kills a different person from the one whom he intended to kill, the law nevertheless holds the assailant responsible for his felonious intent, merely transferring its direction from the original object of the attempt

342

to the person killed, and the homicide so committed is murder. The degree of guilt is the same as it would have been if the attempt had resulted in the death of the person at whom it was aimed."

■ The crime may be murder although the person killed was not the one whom the accused intended to kill. (40 C.J.S. 864, § 18.) One of the first cases in this state applying the so-called doctrine of transferred intent appears to have been *People* v. *Suesser,* 142 Cal. 354 [75 P. 1093], in which the first paragraph of the criticized instruction was given and expressly approved. The court stated (p. 366):

" 'In determining the criminality of the act of killing it will be immaterial whether the intent was to kill the person killed or whether the death of such person was the accidental or otherwise unintended result of the intent to kill some one else—the criminality of the act will be deemed the same.' . . .

"[P. 367.] The court therefore did not err in refusing defendant's instruction on this subject. We see nothing in the contention that the instruction on this subject, given at the request of the people, invaded the province of the jury. No other objection that demands notice is made thereto, and, so far as we can see, it correctly stated the law upon the subject under discussion."

*People* v. *Weeks,* 104 Cal.App. 708 [286 P. 514], says (p. 712): "In the case before us we have all the elements of this crime [first degree murder]. The malice was express, also the intent to take life, and because the defendant, in carrying out his threats and his felonious intent, took the life of his friend rather than the life of his supposed enemy, cannot excuse his act or reduce the degree of his crime."

*People* v. *Buenaflore,* 40 Cal.App.2d 713 [105 P.2d 621], says (p. 717): "As declared by the decisions hereinafter cited, if one wilfully, premeditatedly and of his malice aforethought commits or attempts to commit an assault upon a certain person with the intention of killing him, but in the execution of his design unintentionally kills another instead, it is nevertheless murder. The intent in such case is transferred by law from his intended victim to the person killed. In other words, the crime is exactly what it would have been if the person against whom the intent to kill was directed had been in fact killed."

*People* v. *Aranda,* 12 Cal.2d 307 [83 P.2d 928], states (p. 310): "Whether the three killings were *the result of the victims obtruding themselves between the defendant and the*

*object of his vengeance* or were the result of 'mistake' in defendant's effort to kill the girl, they would, nevertheless, be murders of the first degree." (Italics added.)

*People* v. *Walker,* 76 Cal.App.2d 10 [172 P.2d 380], states (p. 14): "If he [defendant] aimed to shoot Alfred and by accident hit Vernal, or if he mistook Vernal for Alfred, in either event his murderous intent was by law transferred to the victim."

In *People* v. *Sutic,* 41 Cal.2d 483 [261 P.2d 241], the rule is stated thus (p. 491): " 'Where a person purposely and of his deliberate and premeditated malice attempts to kill one person but by mistake or inadvertence kills another instead, the law transfers the felonious intent from the object of his assault and the homicide so committed is murder in the first degree.' " (Also see *People* v. *Rothrock,* 21 Cal.App.2d 116, 119 [68 P.2d 364]; *People* v. *Weaver,* 71 Cal.App.2d 685, 686-687 [163 P.2d 456]; *People* v. *Neal,* 97 Cal.App.2d 668, 672-673 [218 P.2d 556]; anno. 18 A.L.R. 917.)

It is argued there was no evidence that defendant fired the shot in the mistaken belief he was shooting at John, or that the shooting was inadvertent or accidental, or that Jack obtruded or placed himself between defendant and John. ▮▮▮ We think there was evidence from which the jury could have concluded that Jack obtruded or placed himself between defendant and John. There had been no difficulty of moment between defendant and Jack; there had been between defendant and John. Defendant testified he had no trouble with Jack before the offense in question, "just little arguments." The jury reasonably could have inferred that defendant started up the stairs to kill John; that Jack suspected it or knew it; that Jack, to protect John, had him stay in the room; and that Jack went out of the room and obtruded or placed himself between defendant and John. (See *People* v. *Miller,* 121 Cal. 343, 345-346 [53 P. 816]; *People* v. *Aranda,* 12 Cal.2d 307, 310 [83 P.2d 928].)

▮▮▮ Instructions must be read together as a whole in order to determine whether the jury was properly charged. (*People* v. *Freudenberg,* 121 Cal.App.2d 564, 578 [263 P.2d 875].) The jury was told they were "to consider all the instructions as a whole," and "to regard each in the light of all the others."[1] The jury was fully and adequately instructed on

---

[1] The court also gave this instruction: "The court has endeavored to give you instructions embodying all rules of law that may become necessary in guiding you to a just and lawful verdict. The applica-

self-defense, on other circumstances of mitigation, and on the elements of the lesser included degrees of homicide. The criticized instruction is not based on any unwarranted assumption. The first paragraph begins: "If you find from the evidence"; the second paragraph begins: "If you should find." (*Cf. People* v. *Coltrin,* 5 Cal.2d 649, 658-659 [55 P.2d 1161]; *People* v. *Stanhope,* 37 Cal.App.2d 631, 636 [99 P.2d 1075]; *People* v. *Chait,* 69 Cal.App.2d 503, 521 [159 P.2d 445].) ▮ A party is entitled to have proper instructions given to the jury on his theory of the case if it is reasonable and there is evidence to support it. (*People* v. *Sutic,* 41 Cal. 2d 483, 492-493 [261 P.2d 241]; *People* v. *Byrd,* 42 Cal.2d 200, 208-209 [266 P.2d 505]; *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386, 395 [223 P.2d 862, 21 A.L.R.2d 1206].)

The instruction amounts to no more than a statement that if the jury believed from the evidence the facts stated therein, defendant was as guilty as if he had killed his brother. The instruction was not a comment on the weight of the evidence nor did it express any view that might be held by the court.

The cause was well and fairly tried. The jury was fully, fairly, and accurately instructed on all principles of law applicable to the evidence. We find no merit in any of the assignments of error.

### *The People's Appeal*

▮ The appeal of the People from the order reducing the degree of the offense to second degree murder is predicated on the theory that the trial court did not have the power to reduce the degree of the crime since the evidence was legally sufficient to support the finding of the jury that defendant was guilty of first degree murder. It is argued that under the circumstances of this case the evidence justified the finding of the higher degree, and that on a motion to reduce the trial court has no power to weigh the evidence.

The contention of the People is answered by the recent decision of the Supreme Court in *People* v. *Sheran,* 49 Cal.2d 101 [315 P.2d 5] in which the court expressly held to the contrary of the People's contention. The court there held that the power of the trial court on a motion to reduce

---

bility of some of these instructions will depend upon the conclusions you reach as to what the facts are. As to any such instruction, the fact that it has been given must not be taken as indicating an opinion of the court that the instruction will be necessary or as to what the facts are. If an instruction applies only to a state of facts which you find does not exist, you will disregard the instruction."

the degree of the offense is the same as its power to grant a new trial and that (p. 108), "upon an application to reduce the degree or class of an offense, a trial judge may review the *weight* of the evidence but an appellate court should consider only its *sufficiency as a matter of law*."

The judgment, the order denying a new trial, and the order reducing the degree of the offense are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.