[Crim. No. 7030.   Second Dist., Div. Three.   Oct. 28, 1960.]

THE PEOPLE, Respondent, v. JAMES WILFRED
PALMER, Appellant.

C. V. Eberhard and Karl K. Ransom, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

VALLÉE, J.—A jury found defendant guilty of murder of the second degree. He appeals from the judgment.

Defendant and Robert Gibbons, the deceased, lived together in apartment 4 at 1102 Dawson Street in Long Beach and represented themselves as brothers. The apartment was in a court. During the afternoon of July 1, 1959, defendant was seen entering and leaving the apartment several times. June Clem saw him walking into the court sometime before 5 p. m. About 5:30 p. m. the manager received the rent for apartment 4 from the deceased. A short time thereafter she and June Clem heard a thud.

A few minutes before 6 p. m. Fred Goode saw defendant come in with the deceased. Defendant had the deceased "by the shirt of the right shoulder and was kind of pushing and leading him toward the court." The deceased "had kind of a staring, shocked look on his face, kind of a blank stare, wide-eyed stare. He had his right hand across his stomach. They turned into the court."

Jean Reynolds also saw defendant and the deceased. She said they were side by side; defendant held the deceased by the shoulder. The deceased had his hand over his abdomen; he "looked like he might have been—well, he sort of pinched his face. It was kind of pinched up a little bit like he had a pain. James [defendant] looked rather angry or disturbed about something."

About 15 minutes later defendant walked out of the court to the sidewalk and went toward Goode, stopped, muttered something, shook his head, rubbed his hand through his hair, walked around the building and entered apartment 4 from the rear. Some time later Goode saw Carl Graves standing in front of apartment 4 grasping the screen door. Goode saw someone inside the apartment.

About 7 p. m. Jean Reynolds saw defendant and another person enter the deceased's car "to proceed towards downtown." She thought the other person might have been Graves. Defendant drove away "in a very reckless, hurried manner." The brakes "squealed real loud."

About 7:30 or 7:45 Goode left his apartment and saw Graves standing on the sidewalk near the deceased's car.

Graves testified: He had known defendant about two years; defendant introduced him to the deceased three or four weeks before July 1; he arrived at his home from work about 6 p. m. on July 1; defendant came to his (Graves') home between

6:15 and 6:30 p. m. and begged for money; defendant said I did not realize how badly he needed money, that he had just killed his brother; defendant started to cry, said he had killed his brother with a butcher knife.

Graves also testified: Defendant told him to accompany him to a friend's house to see if they could get money; they drove around, stopping at two places which defendant entered, leaving him in the car; defendant told him several times that if he told anybody or if he made any motion to let anybody know what he had said, he would kill him; defendant said he (Graves) did not realize how serious it was and he was going to show him the body; they drove to apartment 4 and defendant showed him the deceased's body in the apartment; the deceased was lying on his back "wrapped in something"; he (Graves) was stunned; defendant said, "See, there is what I have done," pointing to the body; defendant opened a dresser drawer and took out what looked like socks; defendant said he (Graves) still did not realize how serious it was and reached to unwrap the body to show it to him; he jerked loose, said "No," grabbed the door, went out, and walked to the car; defendant followed him; they got in the car and defendant drove to his (Graves') apartment; defendant went in with him and asked him to make some coffee; he made it and defendant drank it; defendant's eyes were bloodshot; defendant "got angry" and said several times he was going to kill him; he gave defendant the $2.00 he had; defendant said he was going back to his apartment after something and wanted him to go with him; he would not go; defendant got angry, pushed by him, and went out, saying, "All right, God damn it, stay here, but you better be here when I come back, because I will be right back"; he went out on the sidewalk; remained there 15 to 20 minutes; he wanted to get away; defendant did not come back; he got in his car and drove to his father's home in Artesia.

Graves testified further: At one point defendant told him he wanted the money to get away, there was someone at Lake Tahoe who would help him; when they were in defendant's apartment defendant did not tell him what he had done with the knife, he merely said he had washed it; he asked defendant why he had killed his brother; defendant said, "The same old thing," which to him (Graves) meant nothing; he arrived at his father's home about 9:45 p. m., told his parents what had happened, and his father telephoned the police. Graves met the police in Long Beach and told them what had

happened. He had been convicted of a felony and was on parole at the time.

Officer Berry of the Long Beach Police Department went to defendant's apartment and entered. Defendant was not there. He testified: "There was no evidence of a struggle. Everything seemed to be pretty well arranged. I observed the deceased lying on a couch, this couch being located on the north wall. The deceased was lying on his back. His head was in a westerly direction, feet east. He had a dark-colored pillow under his head. His feet were on the east arm-rest of the couch. He had a chenille-type dark bedspread wrapped around him, exposing only his head and his feet." On the drainboard in the kitchen there was a butcher knife with a 4-inch handle and a 5-inch blade. The drainboard was damp. About 11:25 p. m. defendant entered the apartment and was arrested. He appeared to be under the influence of a hypnotic, became hysterical, and began to cry. A bottle of phenobarbital tablets was found in defendant's car.

Officer Shaw testified: He arrived at apartment 4 about 11 p. m.; a chenille material covered the body of the deceased; he attempted to question defendant; defendant did not answer; he was in a state of drug intoxication. About 12:30 p. m. he had a conversation with defendant. Defendant's face was contorted at times and one eye was closed. Defendant told him he was an epileptic and took drugs to ward off seizures; that about 7 p. m. he took a walk and when he returned the deceased was in the same position he was in when he was arrested. Shaw asked him if he had killed his brother; defendant said he had not. When questioned as to the statement Graves said he had made, defendant said he made some statement to Graves regarding his brother's death but that it was a "mere whim." Shaw "asked him about a wallet containing the victim's identification, which was found on his person after his arrest, and he stated that prior to leaving the house, after finding the victim on the divan, he decided to take it with him on the spur of the moment." Since defendant "was getting progressively sleepier," Shaw discontinued further questioning.

On July 4 Shaw had another conversation with defendant. Defendant "was rational. Apparently physically he was not in perfect condition. He did not have full use of his hands. He couldn't handle a cigarette." Shaw testified: "I asked him regarding Carl Graves' statement, and whether or not he had made such a statement, and he didn't give me any

answer. He just shook his head. I then described the crime scene, including the body and the nature of the wounds, the fact that the chenille bedspread had been placed over his body, that his head was lying on a pillow, and asked him if he had placed the victim in that position, and again asked him if he had killed him. He at that time started screaming, 'Stop. Stop. Are you enjoying yourself?' ''

On July 10 Shaw and Officer Henry talked to defendant. Shaw testified: ''I asked the defendant first regarding any pills which might have started his intoxication and his hospitalization at the time of the arrest. He stated again that he had never taken any pills in any greater amount than was prescribed normally by the doctor. He stated to me, on further questioning along the same lines, that when I had allowed him to go to the bathroom at the scene of this incident to wash his face that he had taken a large amount of pills which were on the wash basin, and had taken them all at one time and covered that action by wiping his face off with a towel.'' Defendant said he left the apartment between 5:30 and 6 p. m., drove around, stopping at various places, returned to the apartment, ''saw a couple of police cars and several women standing about in nightgowns and someone jumped out of the bushes and asked him if he was Jim and placed him under arrest''; when he was taken into the apartment where his brother was he went into a state of shock, formulated a plan to kill himself, and attempted to do so by taking the pills in the bathroom. Defendant stated again he had not killed his brother. He said ''he had had no conversation with Graves that evening and never had seen him. A moment or two later he said, 'Yes, I did see Graves.' '' Shaw testified: ''I then asked him what the conversation related to that he had with Graves. He stated that some time during the period that he had been driving around town he had stopped at Graves' apartment. Seeing that Graves' brother was in the apartment also he asked Graves to step outside and talked to him; that they had walked to a nearby used-car lot where they had a conversation which was exclusively about whether or not Graves knew of any job openings for him, the defendant. Q. Did he say how long that conversation lasted? A. Yes. He said he talked to him for about a half hour. I went over a detailed description of what Graves told me regarding the events of that evening and what statements had been made to him by the defendant. When I had concluded that, the defendant stated that he didn't know why Graves would make a

statement like that; that it was not true. . . . And that the statement was not true, or if it was true, he didn't know why he would say it. I then related to him some of these statements that I had obtained from witnesses regarding their contact with the suspect and their observations of the suspect's activities, or the defendant's activities, and he stated, 'They all must have been lying.' "

Defendant was the beneficiary of a $4,400 policy of insurance on the life of the deceased.

The autopsy surgeon testified the cause of death was multiple stab wounds of the chest and abdomen and hemorrhage resulting therefrom; there were 10 wounds; "[t]he substantial parts of the point of impact were into the large body cavities, namely, the chest and the abdomen, both of which were filled with blood"; there was a wound in the left upper chest, one in the left upper quadrant of the abdomen, which went through the body wall and perforated the stomach, a series of wounds in the back which "entered at the midline and then radiated from one side to the other and in doing so lacerated and penetrated the lungs"; one on the side of the chest which "passed through the chest cavity and the diaphragm and penetrated and lacerated the liver"; two flesh wounds, one on the right arm and one on the left arm; other than these two, the wounds "were all serious wounds. They all penetrated vital structures and were associated with the hemorrhaging." The wounds were "consistent" with knife wounds and they might have been caused by the butcher knife found in defendant's apartment.

Referring to the wound in the abdomen, the surgeon testified: "Q. May I ask you this: Would it be possible for that wound to have been inflicted and yet for the later deceased person to have walked or ran any distance? A. This wound and this wound path did not immediately involve any vital structures, nor was it necessarily associated with any great amount of hemorrhage, from what the autopsy evidence shows, and I would say yes, it would have been possible for the individual to survive the wound sometime and also be capable of some physical activity during that time. . . . Q. This wound that you have been speaking of in the right upper quadrant of the abdomen, do I understand correctly that it of itself did not pass through any lungs, is that right? A. No. Q. It was not such a wound as would necessarily and of itself have caused death, is that right? A. No. . . . Q. It is a fair statement, is it, Doctor, that in connection with the death of the

individual as depicted in those pictures, there was more than likely not any struggling, no bodily contact or engaging? A. On the basis of what I have said, from my medical observation, I would be surprised if there was any violent or excessive physical activity on the part of the victim."[1]

Testifying in his own behalf, defendant denied killing the deceased and denied telling Carl Graves he had done so; he did not see Carl Graves at any time on July 1; he had known the deceased since 1948; they lived like brothers and held themselves out as such; in 1956 he was convicted of a felony— selling narcotics.

Defendant first asserts the evidence is insufficient as a matter of law to sustain the verdict of murder of the second degree.

"Murder is the unlawful killing of a human being, with malice aforethought. (Pen. Code, § 187.) 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provoca-

---

[1]In this connection, the surgeon testified on cross-examination: "Q. Based on your experience, wouldn't it, Doctor, indicate from this number of wounds and the type of wounds in the place of the administration, wouldn't that indicate to you a rather intense struggle-type of situation? A. Well, there are two cardinal things lacking here. There are three cardinal things that would indicate struggle. Number 1, is the lack of bruising or abraiding injuries of this individual. He had no lacerations about the mouth such as a fistic wound would be expected to cause. The inner surface of the scalp when it was reflected to open the calvarium showed no evidence of bruising, such as pommeling, beating or any kind of assault with a blunt object would indicate.

"The absence of those things are general qualifications, and, also, in association with that there is no evidence of injury around the neck, such as a constricting or bruising force to the neck would cause. Also, in knife wounds very frequently there are what are called defense lacerations of the hands and these are rather conspicuous things, where a person is trying to ward off a knife will reach out and actually grab the blade of the knife with the hands and around the hands there are inflicted severe lacerations down to the bone, and even sometimes involving the bone and partial dismemberment of the hands.

"The third thing that is absent here which would indicate violent activity, at least, on the part of the victim, is a lacerating or tearing character of the given stab wounds. These wounds all had the character of an in-and-out in just about the same path character pattern. In other words, there was no evidence of twisting of the knife or further laceration of the surface. All of these wounds at the surface were at the order of about three-quarters of an inch in their greatest dimension, which is just about of this particular instrument, which I am not sure is the one that inflicted it, but incident to our testimony, it is just about the size of this particular instrument, and if there had been actual twisting of the individual at the time, I personally would have expected more of a lacerating character of the wounds, at least, at the surface, and certainly at the deeper extremity."

tion appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (Pen. Code, § 188.) 'All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.' (Pen. Code, § 189.)

" 'Murder of the second degree: a willful act characterized by the presence of malice aforethought and, at least ordinarily, by the specific intent to kill, and by the absence of premeditation and deliberation.' (*People* v. *Bender,* 27 Cal.2d 164, 181-182 [163 P.2d 8].)

" 'When an unlawful assault is made with a deadly weapon upon the person of another, resulting in death, and the assault is not provoked or perpetrated in necessary self-defense, or in the heat of passion, malice may be presumed. Under such circumstances, the killing may constitute murder of the second degree when it is not perpetrated by means of poison, lying in wait, torture, or any other kind of wilful, deliberate or premeditated killing.' (*People* v. *Butterfield,* 40 Cal.App.2d 725, 729 [105 P.2d 628].)" (*People* v. *McAuliffe,* 154 Cal.App.2d 332, 338 [316 P.2d 381].)

There was ample evidence that defendant was capable of forming the required intent. It may fairly be inferred that the killing did not occur as a result of any deliberation or premeditation. It is not for this court to weigh the probabilities. Our only function is to determine whether there is evidence which leads to the conclusion of guilt of second degree murder without doing violence to reason and logic. (*People* v. *Morton,* 79 Cal.App.2d 828, 842 [181 P.2d 32].) The evidence clearly warranted a conviction of second degree murder. (*People* v. *Mendes,* 35 Cal.2d 537 [219 P.2d 1]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Jones,* 136 Cal.App.2d 175 [288 P.2d 544]; *People* v. *Endner,* 73 Cal.App.2d 20 [165 P.2d 712]; *People* v. *Efstathiou,* 47 Cal.App.2d 441 [118 P.2d 22]; *People* v. *Buenaflore,* 40 Cal.App.2d 713 [105 P.2d 621]; *People* v. *Butterfield,* 40 Cal.App.2d 725 [316 P.2d 381].)

It is argued that the testimony of Graves is so inherently improbable as to be unworthy of belief. It is said Graves claimed he was in fear of his life and yet he had many

opportunities to escape from defendant and made no attempt to do so. ▮ "To be improbable on its face, the evidence must assert that something has occurred that it does not seem possible could have occurred under the circumstances disclosed, and the improbability must be apparent. (*People* v. *Braun,* 14 Cal.2d 1 [92 P.2d 402].) To come within the rule of inherent improbability, testimony must be such that it is physically impossible for it to be true, or its falsity must be apparent without resort to inference or deduction. (*People* v. *Mason,* 130 Cal.App.2d 533, 534 [279 P.2d 621].)" (*People* v. *Norman,* 175 Cal.App.2d 348, 352 [346 P.2d 221].) ▮ We find nothing in the testimony of Graves that could not have occurred under the circumstances disclosed. Nor can we say that its falsity is apparent without resort to inference or deduction. The weight to be given the testimony of Graves was the concern of the jury, not this court.

▮ Defendant requested and the court refused to give instructions on the offense of manslaughter. The instructions are not in the record and normally the point would not be considered. (*People* v. *Pierre,* 178 Cal.App.2d 585, 594 [3 Cal.Rptr. 290].) However, in view of the fact that defendant acted in propria persona in requesting preparation of the record, we have considered the point. The attorney general has commendably conceded that defendant requested and the court refused to give CALJIC 308, 308-A, and 308-B.

▮ It is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter. (*People* v. *Carmen,* 36 Cal.2d 768, 773-774 [228 P.2d 281].) ▮ "[I]f it must be said as a matter of law that, accepting the defendant's version of what took place, the crime could not have been manslaughter, the defendant was not entitled to such an instruction." (*People* v. *Zilbauer,* 44 Cal.2d 43, 49 [279 P.2d 534].) ▮ There was no evidence from which the jury could have returned a verdict of manslaughter. Defendant denied he killed the deceased. He offered no evidence of provocation or mitigation. The fact that there were 10 wounds on the body of the deceased is not, in itself, evidence of manslaughter, as defendant appears to argue. There was no evidence of a struggle. The court did not err in refusing the instructions on manslaughter.

▮ Over defendant's objection the court admitted in evidence five photographs of the body of the deceased showing the stab wounds. Defendant assigns error. The autopsy

surgeon used the photographs in describing the wounds.
When allegedly gruesome photographs are offered in evidence, the trial court must decide whether their probative value outweighs their probable prejudicial effect. (*People* v. *Love*, 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705].)
The photographs in the present case were not gruesome. In one, the deceased was fully clothed, showing merely a stab wound in the right arm. In others, the body was exposed from about the waist up and merely showed the places where the knife entered the body. The trial court did not abuse its discretion in admitting the photographs.

We find no error in the record.

Affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 21, 1960.