[Crim. No. 13420.   Second Dist., Div. One.   Dec. 14, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD ALLEN BATES, Defendant and Appellant.

Roger S. Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Richard H. Cooper, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of involuntary manslaughter (Pen. Code, § 192.2) a lesser and necessarily included offense in the charge contained in the information.

On or about June 15, 1966, in an information filed in Los Angeles defendant was charged with murdering Robert A. Stevenson with malice aforethought on May 10, 1966. Defendant pleaded not guilty and after a trial a jury returned a verdict of guilty of involuntary manslaughter (violation of the provisions of section 192.2, Penal Code). Proceedings were suspended, probation was granted for five years, a part of the terms being that defendant spend the first year thereof in the county jail. A timely notice of appeal was filed from the judgment (order granting probation, Pen. Code, § 1237, subd. 1).

A résumé of some of the facts is as follows: Shortly before the closing hours of a bar in Redondo Beach, defendant and six other persons, William Hodgson, Raymond Norman, Mr. Headley (Slim), Mr. Watts, Robert Stevenson, and the barmaid, Sharon Skeen, engaged in conversation. Defendant bought a round of beer for those in the establishment and invited those present to his restaurant, the New Orleans Kitchen, next door, upon the closing of the bar to have a sandwich and some more beer. Before leaving the bar defend-

ant purchased two six-packs of beer and took the same with him to his restaurant. While in the bar defendant and Norman had a conversation during which defendant apologized for having drawn a knife on Norman on a previous occasion. Norman and Stevenson had known each other for a matter of about six months at the time in question. After the bar closed Hodgson, Norman, Watts, "Slim," Stevenson and the barmaid walked to defendant's restaurant. Defendant opened his restaurant upon the closing of the bar. Defendant served some sandwiches to some of the group and served some beer to those present. Defendant went back and forth to the kitchen from the front of the restaurant, where those named above were seated on counter stools. Watts left about 3:30 a.m., and the barmaid left earlier. Between the kitchen and the front of the establishment, where the counter and stools were located, there were swinging louvered bar doors which were about 8 or 10 inches apart in the middle. Hodgson had been in the kitchen and had talked with defendant about whether he might have any trouble with Stevenson or Norman and defendant replied, " 'There is nothing that I can't handle. I have several knives back here, if anybody ever tried to rob me or give me any trouble.' " Hodgson responded by saying that he, defendant, should not "use a knife on somebody or he'd probably get in trouble" and defendant responded in effect that he could "take care of it." Several times Stevenson asked or intimated that he would like to see the kitchen and defendant responded in the negative. Defendant stated that it was "his kitchen and he had the right to keep people out of it if he wanted to."

Defendant brought a glass of whiskey to Stevenson and he consumed it; he also brought beer to Stevenson and the others. The consensus of opinion seemed to be that everyone was at least under the influence of liquor. Whiskey was offered at least to one of the other persons present and refused because he did not see it poured. Later defendant brought beer to some of the others but refused to bring any to Stevenson.

At about 5 a.m. apparently through persuasion of others, or otherwise, defendant told Stevenson, "If you want to look, look" into the kitchen. Defendant explained in effect that he meant for Stevenson just to look through or over the swinging doors into the kitchen but not to enter the kitchen. Stevenson and defendant in any event walked into the kitchen. Defendant testified that Stevenson opened up a refrigerator and took

lids off the pots on the steam tables and looked around, that he (defendant) asked Stevenson to get out of the kitchen, that he was not wanted there and then that defendant grabbed Stevenson by the arm to pull him out of the kitchen and the two engaged in a "tussle." Defendant testified that Stevenson grabbed a knife, they scuffled and Stevenson made a lunge toward defendant and stuck him in the hip area with a knife. That defendant grabbed the hand of Stevenson which held the knife and pulled the knife out of defendant's leg. Defendant secured the knife and under the circumstances was afraid for his life. Stevenson was stabbed in the left side of the mid-back area by defendant. The knife penetrated the blood vessels in the left lung area and Stevenson died from a massive hemothorax. An autopsy was performed on Stevenson and it was determined that he had a blood alcohol of 0.14 per cent and his urine showed 3/10ths milligram per cent of amphetamine type base drug. Also found lodged in the rectal cavity of Stevenson was a packet of amphetamine tablets (sometimes known as "pep pills") in silver foil. There were other stab or cut wounds on or into Stevenson which the autopsy surgeon stated required several different strikes or motions of a knife.

One of the witnesses related that he heard loud talk in the kitchen after defendant and Stevenson entered the kitchen and that they were there from 5 to 10 minutes and then there was scuffling and noises. Another witness stated that defendant and Stevenson were in the kitchen not to exceed a total of two minutes. The latter witness stated that he heard Stevenson call out, "Look out, Ray" (Raymond Norman), that defendant was facing him toward the room where the counter and stools were located, that Stevenson was facing the defendant with his back to the witness, that defendant grabbed Stevenson and "started sticking the knife in him," that "it looked like he had already stuck him once with the knife, and he pulled it out and came back down with it again."

Stevenson fell to the floor, defendant ran out of the kitchen into the counter and stool room of the restaurant and called out, "Quick, run, call the cops."

Defendant testified further that he probably was "cussing or something," that with reference to the stabbing or cutting of Stevenson he did not "know exactly how that happened."

Appellant now asserts in effect that the evidence is insufficient to support the judgment, that he acted in self defense.

Appellant has seen fit to cite a part of a remark of the trial

judge at the time of sentencing to show that the judge "did not feel that the evidence supported the conviction." The entire statement of the judge at the time was, "I actually was somewhat surprised that the jury convicted the man, and yet I am satisfied that he needlessly and uselessly took a human life. Even though the other person was on his premises there was no reason for his taking this life."

Appellant's contentions to the effect that the evidence shows as a matter of law that the homicide was justified, committed in self defense, is predicated largely on his own testimony.

■ " ' "If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self defense. 'A man has not . . . the right to provoke a quarrel and take advantage of it, and then justify the homicide.' Self-defense may be resorted to in order to repel force, but not to inflict vengeance. . . . 'There is certainly no law to justify the proposition that a man may be the assailant and bring on an attack, and then claim exemption from the consequence of killing his adversary on the ground of self defense.' " ' [Citation.]

■ "Defendant's contention that the evidence shows as a matter of law that the homicide was justifiable, committed in self-defense, is predicated largely on his own testimony. The jury was not required to accept defendant's version of the killing. [Citations.]" (*People* v. *McAuliffe*, 154 Cal.App.2d 332, 340 [316 P.2d 381]; see also *People* v. *Davis*, 63 Cal.2d 648, 653-655 [47 Cal.Rptr. 801, 408 P.2d 129].)

■ A "justifiable homicide connotes only the use of force which is necessary, or which reasonably appears to be necessary, to resist the other party's misconduct; that use of excessive force destroys the justification, but the question of whether there was such an excess is ordinarily one of fact for the jury to determine." (*People* v. *Young*, 214 Cal.App.2d 641, 646 [29 Cal.Rptr. 595].)

■ Even if it is assumed, as testified by appellant, that deceased began the affray, the jury could well have found that the force used by appellant under the circumstances far exceeded the amount of force necessary to defend himself. (See *People* v. *Jackson*, 202 Cal.App.2d 179, 183 [20 Cal.Rptr. 592].)

Clearly in this case the jury could have found, and evidently did find, that the sticking of the knife into the back of deceased was the proximate cause of the death of the victim.

It is clear too that the jury believed that defendant, at the time of the use of the knife, was acting in an unlawful manner.

Appellant appears to be convinced that because he was the only person to testify with reference to his state of mind on the occasion of the scuffle, that the jury was required to believe him. Such is not the law.

We have examined the jury instructions given by the judge to the jury and it is our belief that the jury was fully and fairly instructed with reference to all facets of the case, including self defense, credibility of witness, excusable homicide, guiding principles (CALJIC No. 322), reasonable man standard (CALJIC No. 327a), retreat of assailed person (CALJIC Nos. 322a-322b), ejection of trespasser (CALJIC Nos. 321d-321e), and the force that may be used in the defense of property (CALJIC No. 321h).

The order granting probation is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 8, 1968.