[Crim. No. 18295. Second Dist., Div. One. Oct. 14, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
SOLOMON HARRIS, JR., Defendant and Appellant.

**COUNSEL**

David Silverton for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Gaye W. Herrington, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**LILLIE, J.**—Charged with murder (Pen. Code, § 187), defendant was convicted in a jury trial of voluntary manslaughter (Pen. Code, § 192, subd. 1), a lesser and necessarily included offense; the court found to be true a prior felony conviction. Defendant appeals from the judgment.

On the date of the homicide (July 24, 1969), defendant was employed as a clerk in a Los Angeles liquor store located at 47th and Western Avenue. In the early evening of the above date, Robert Ricks (the victim), aged about 18 years, and three male friends purchased some potato chips and "pop" from defendant; they were there for several minutes and left without any untoward incident, although there was testimony that the victim had been drinking—he had earlier consumed a couple of beers. After their departure, defendant subsequently told another customer that some "kids" had come in, they had been "messing" with him, he did not know whether they were armed, and he was going to protect himself. Thirty minutes later the victim returned with one of his friends; a prosecution witness (Billy Earl Police) stated he appeared to be drunk.

Although there were other customers waiting to be served, defendant addressed the victim and stated that he would take him first. The victim, who was standing by the stocking display, said: "No, wait on the other customers first." Defendant then walked away from the cash register and went over to the stocking display, saying to the victim: "It's your [obscenity] turn. I'm waiting on you now." The victim replied, "What's the matter, brother?" to which defendant said, "Now I'm sick and tired of this [obscenity]. It is your God-damn turn now." The above exchange went on for about five minutes; meantime, other customers were telling defendant, "You can wait on me now" or "Wait on me." Finally, defendant left the victim, went back to the other customers and served them, but before doing so, he (defendant) picked up a gun and laid it on the counter behind the cash register.

When defendant had waited on all the customers, the victim walked down to the cash register; he acted as though he wanted defendant to wait on him next. After putting his right hand on the counter, he said to defendant: "Brother, what's the matter?" The latter kept repeating: "Get your [obscenity] ass out of here before I do something that I don't want to do. Get your [obscenity] out of here." The two were then about three feet apart; according to one witness (Billy Police) there was no bulge in the victim's left pocket and he made no type of threatening gesture. Defendant then grabbed his gun; without saying anything or threatening with the gun, he fired once in a very quick motion. After the shot, the

victim fell. Defendant started to jump up and down, asking if the victim was dead. Told that he was still alive, defendant said: "That [obscenity] going to die. I know God-damn well he's going to die." He then threw the gun behind the register and said he was going to call the police.

Officer Peters and his partner arrived at the scene about 7:20 p.m. The victim was lying on the floor with a gunshot wound in the abdomen; he was still breathing. An ambulance was called, and the victim was removed to a hospital; he was pronounced dead at 1:40 a.m. the next day. After waiving his constitutional rights, of which he was advised by Peters, defendant told the officer that the victim and another person entered the store about five minutes prior to the shooting; they took some alcoholic beverages and hid them under their shirts and he believed they were going to leave the store with them; he then took the "booze" away from them and they left, after the victim had hit him in the stomach; about five minutes later, the victim returned and positioned himself in front of the counter with his right hand in his pocket, saying to him: "I am going to kill you"; he (defendant) then picked up a .45 caliber revolver, positioned beneath the counter, and fired one shot at the victim. Defendant told the officer that he had previously told the victim several times to leave the premises. (It was stipulated that neither the police nor any ambulance attendant found any type of gun on or near the victim's person.)

The first contention is made, as it was below, that defendant had reasonable ground to fear for his life and acted accordingly. Such claim of self-defense is predicated largely on defendant's own version of the tragic affair, although there was considerable corroborating testimony by other witnesses. "Defendant's contention that the evidence shows as a matter of law that the homicide was justifiable, committed in self-defense, is predicated largely on his own testimony. The jury was not required to accept defendant's version of the killing. [Citations.]" (*People* v. *McAuliffe,* 154 Cal. App.2d 332, 340 [316 P.2d 381].) ■ It is further established, by numerous decisions that a "justifiable homicide connotes only the use of force which is necessary, or which reasonably appears to be necessary, to resist the other party's misconduct; that use of excessive force destroys the justification, but the question of whether there was such an excess is ordinarily one of fact for the jury to determine." (*People* v. *Young,* 214 Cal.App.2d 641, 646 [29 Cal.Rptr. 595].) Thus, in light of the foregoing, "Even if it is assumed, as testified by appellant, that deceased began the affray, the jury could well have found that the force used by appellant under the circumstances far exceeded the amount of force necessary to defend himself." (*People* v. *Bates,* 256 Cal.App.2d 935, 939 [64 Cal.Rptr. 575].) ■ On the present record the above issues pre-

sented questions of fact for the jury, with whose conclusion we will not interfere. (*People* v. *McAuliffe, supra,* p. 340.)

Defendant did not take the stand; such decision was made after the denial of his motion to prohibit the prosecutor from asking impeaching questions based on his 1958 felony conviction (alleged in the information) of assault with a deadly weapon. (Pen. Code, § 245.) ■ He now claims that the California rule of evidence permitting such impeachment (Evid. Code, § 788) violates the due process requirements of both federal and state Constitutions, although he concedes that as recently as *People* v. *Goodman,* 8 Cal.App.3d 705, 707 [87 Cal.Rptr. 665], such claim of unconstitutionality was held untenable. We cannot accede to defendant's suggestion that we "reconsider" the validity of the above rule; as pointed out in *Goodman* "[T]he California Supreme Court has considered this question a number of times, uniformly holding that a defendant who testifies may be impeached by proof of a prior felony conviction, and that such impeachment does not offend the due process clause of either the federal or the state Constitution. [Citations.]" (*People* v. *Goodman, supra,* p. 707.)

Defendant's third, and final, point relates to the instructions. ■ Although some 49 instructions were jointly requested by both prosecution and defense, and all were given either as requested or in modified form, it is now contended that a *sua sponte* instruction of "an affirmative nature" as contrasted with "so many negative instructions" should have been given. Based on section 199, Penal Code, such "affirmative" instruction would have told the jury that "The homicide appearing to be justifiable or excusable, a person indicted must, upon his trial, be fully acquitted and discharged." The contention is utterly lacking in merit. The jury was fully and fairly instructed with reference to all facets of the case, including excusable homicide, justifiable homicide (in self-defense), the right of self-defense and reasonable man standards. Furthermore, in their effect certain of the given instructions on justifiable and excusable homicide closely parallel that here proffered by defendant for the first time on appeal: "The killing of a human being is excusable and not unlawful when committed by accident and misfortune . . ." and, "A homicide is justified and not punishable when committed by a person in the lawful defense of himself . . . ." As in *People* v. *Crawford,* 259 Cal.App.2d 874, 877 [66 Cal.Rptr. 527], "The characteristics of this case throw it into the second category, in which the defense must proffer an instruction before assigning its absence as error on appeal." Earlier, in *Crawford,* the court pointed out that "The demarcation between trials demanding an instruction *sua sponte* and those interposing a defense request as a precondition is drawn in *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal. Rptr. 683, 348 P.2d 116]: '. . . In determining what instructions a trial

court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested.

" 'The rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.

" 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court.' " (P. 877.)

The judgment is affirmed.

Wood, P. J., and Thompson, J., concurred.