Filed 3/22/13  P. v. Pulley CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060502 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD231564) |
| ROBERT G. PULLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed.

I.

INTRODUCTION

Defendant Robert G. Pulley appeals from a judgment of conviction entered after a jury convicted him of second degree murder, battery, and making a criminal threat.  The murder victim was Pulley's neighbor.  The victim of the battery and criminal threat was Pulley's son.

On appeal, Pulley contends that there is insufficient evidence to support the murder conviction. He first argues that his conviction for second degree murder based on the shooting of his neighbor must be reversed because "the only reasonable conclusion from the evidence was that [he] acted with the legal justification of defending against harm to a person within one's home or . . . his property." He argues in the alternative that even if this court does not agree that the evidence demonstrated that his act of shooting his neighbor was justified, his conviction for second degree murder should be reduced to voluntary manslaughter because the evidence supports a finding that he acted under the heat of passion, and does not support a finding that he acted with implied or express malice.

Pulley also contends that the trial court should have granted his motion to sever for trial a fourth count charging him with making a criminal threat against his wife—a count on which he was acquitted—from the other three counts in the case.

We reject all of Pulley's contentions on appeal, and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *The November 11, 2010 threat (count 4)*

On November 11, 2010, Pulley and his wife Angela had been drinking alcohol. At 9:37 p.m., Angela called 911 because Pulley wanted to go to a bar, and she felt that he had already had too much to drink. A recording of the 911 call was played for the jury. On the recording, Pulley can be heard shouting that he had a gun and that he was going to

2

kill himself and kill his wife. He also shouted that Angela had threatened him, pulled a gun on him, and tried to kill him.

Angela told the dispatcher that Pulley had a .45-caliber gun, but said that she was not worried about her safety. The dispatcher told Angela that she had to take seriously what Pulley was saying. Angela told the dispatcher that there were other guns in the house, but that those guns were locked in a safe.

Another dispatcher located Pulley's address through the automatic firearm system and determined that there were four or five firearms registered at that address. The dispatchers sent 15 police units to the Pulley residence on Brown Street in Oceanside.

When officers reached the Pulley residence, they heard a loud argument between and man and woman. The front door to the house was open, but a security screen door was closed. An officer could see Pulley, with his arms crossed, facing the door. Angela had her back to the door and was saying to Pulley, " 'Put it away, just put it away.' " Pulley was heard saying, " 'Fuck that. If they want me, I'm right here.' "

Angela came out of the house and was met by Oceanside Police Sergeant Carl Regalado. Angela told Regalado that Pulley had a .45-caliber handgun. Officers set up a perimeter around the house. Pulley refused to come out of the house. After approximately two hours, officer started to leave, concluding that there was not probable cause to arrest Pulley for making criminal threats because Angela had told the police that she was not in fear for her safety.

Angela testified at trial that she never felt fearful of Pulley during this incident.

3

2.	*The December 25, 2010 battery and threat (counts 2 and 3)*

At approximately 12:30 a.m. on December 25, 2010, Sergeant Regalado responded to a noise complaint call from the 3900-block of Brown Street in Oceanside. The only house that appeared to have anything going on was that of the Misaalefua family, who lived across the street from Pulley's house. The garage door at the Misaalefua residence was up, and there were fewer than a dozen people in the garage. Regalado spoke with Jimmy Misaalefua, the host of the party, told him about the noise complaint, and talked with him about ways that the group could be quieter. Misaalefua was cooperative and apologetic. After talking with Misaalefua, Regalado left.

At 1:53 a.m., Regalado returned to Brown Street in response to a call for police assistance called in by paramedics who had arrived in response to what had originally been a call for medical assistance. An earlier call from Pulley's son, Matthew, stating that a woman had fallen and needed medical assistance had resulted in a paramedic and fire response. When Regalado arrived, he saw four firefighters restraining Pulley, who was on the ground in front of his residence. The firefighters explained that when they arrived in response to the medical call, Pulley told them that he had a shotgun in the house. The firefighters asked Pulley not to go inside until they administered medical aid, but Pulley ignored them and started to go into the house. At that point, the firefighters felt that it was necessary to restrain Pulley.

Regalado and other officers completed a safety sweep of the residence. They found Angela upstairs, in bed, covered with blankets. Officers called out to her but got no response. They then tapped on her shoulder and were able to awaken her. Angela

4

acted as if she had been unaware that the police were there, and told the officers that she was fine and did not need any help.

Matthew explained that he and Pulley had gotten into a fistfight earlier that evening. Matthew did not want to authorize an arrest of Pulley, but he did not want to go back into his house. Officers gave Matthew a ride to a nearby restaurant, and Pulley was released at his residence.

At trial, Matthew testified that his mother had fallen while trying to break up a physical altercation between Matthew and his father. Matthew called the fire department to check on his mother and make sure she was not hurt. According to Matthew, the fight between him and his father had started when Matthew and his father were talking about the Marines and the Army, and Pulley "felt disrespected." During the altercation, Pulley poured a drink on Matthew, and Matthew went outside to cool off. When Pulley went outside to apologize, Matthew threw Pulley into the pool. Matthew then went inside and began teasing Pulley. Pulley hit Matthew in the face, knocking him down. Matthew then went outside and challenged Pulley to fight. When Pulley walked outside to meet Matthew, Matthew grabbed a golf club and started antagonizing Pulley. At this point, Pulley started to walk back into the house, and said that he needed to get away before he shot, stabbed, or killed Matthew. Matthew told the police that Pulley had made direct threats, saying, "I'm gonna kill him, I'm gonna shoot him and stab him." Matthew said that he knew that Pulley was capable of carrying out the threats.

5

3.    *The December 25, 2010 murder (count 1)*

a.    *Other witness evidence*

Dexter Ena, Misaalefua's nephew, was at Misaalefua's house on Christmas Eve for a family gathering.  Ena saw Pulley walking toward Misaalefua's house and asked Misaalefua who Pulley was.  Misaalefua responded that Pulley was a neighbor.  Ena walked to the back of the garage to get a beer from a refrigerator.  When he returned, he saw Pulley and Misaalefua walking toward the street.  Misaalefua had his arm around Pulley and it appeared that they were talking in a friendly manner.

Ena walked toward the street.  When he got to the end of the driveway, he saw Pulley fall to the ground.  Misaalefua was standing over Pulley, and Ena assumed that they were fighting.  Ena ran to where Misaalefua was standing and asked what was going on.  Misaalefua told Ena to " 'leave it alone.' "  Another of Ena's uncle's, Matt Young, ran over to try to separate Misaalefua and Pulley.

Pulley got up from the street and said to Misaalefua, " 'I thought we were friends.' "  Pulley then assumed a fighting stance.  Young tried to push Misaalefua back, and Ena grabbed Pulley and told him to calm down.  Once Misaalefua and Pulley were separated, Ena let go of Pulley.  Pulley started walking back to his house.  As he was walking toward the house, he looked back at Misaalefua and said, " 'I got something for you.  I got something for you, mother fucker.' "  Misaalefua yelled back something like, " 'All right, mother fucker.   Let's go.  Bring it on.' "

As Pulley walked toward his house, Misaalefua followed him.  Ena attempted to stop Misaalefua, telling him to leave it alone and to let Pulley go.  Misaalefua told Ena to

6

"shut up" and continued following Pulley, who had gone into his garage and then into his house.  When Misaalefua walked into Pulley's garage, Ena, who had been following, stopped just outside the garage.  Misaalefua took off his shirt and Ena assumed that he was preparing to fight.  Misaalefua waited approximately five to 15 feet outside the inner garage door.

Ena and Young tried to convince Misaalefua to return to his house with them.  Ena then heard Misaalefua say, " 'What are you going to do with that?  Shoot me[?]' "  Immediately after Misaalefua said that, Ena heard a gunshot.  After the gunshot, Misaalefua said, " 'Is that all you got?  Is that all you got?' "  Pulley and Misaalefua then started wrestling, and Ena heard more shots.[1]

Ena moved through the garage and tried to shield himself behind a car.  Young ran up to the left side of a car that was parked in the garage.  Misaalefua was fighting with Pulley over the gun.  Young reached the two men before Ena could.  When Young got to the men, they all fell down.  Young yelled at Pulley to let go of the gun.

Pulley was on top of Misaalefua when Ena got to them, and Young was on top of Pulley, trying to get the gun.  Misaalefua said, " 'Get this mother fucker off of me.' "  Ena told Pulley to let go of the gun, and tried to pull the gun away from Pulley.  As Ena tried to get the gun away, Pulley bit Ena, and Ena hit Pulley.  At that point, Young and Pulley both partially fell off of Misaalefua.  Ena told Misaalefua, " 'Let's move, let's go.' "  Misaalefua just kept repeating, " 'Get this guy off of me, get this mother fucker off of

---

[1]     Although Ena's testimony was that there were "more gunshots," it seems clear from the evidence that Pulley fired a total of two times.

me.' "  As Misaalefua spoke, his voice started to fade.  Ena kept trying to hit Pulley to make him to let go of the gun.  This continued until the police arrived.

Sao Young, Misaalefua's sister-in-law, called 911 at 2:43 a.m., which was only 13 minutes after Sergeant Regalado had cleared the earlier call involving Pulley and his son.  Sao Young reported that someone had been shot, and that her husband, Matt Young, was wrestling with someone who was holding a gun.

Sergeant Regalado returned to Brown Street in response to a call about shots being fired.  When Regalado arrived, he saw several people engaged in a struggle inside Pulley's garage.  Misaalefua was on the ground with his eyes closed.  A pool of blood was forming around him.  Two women were standing over Misaalefua, crying and grabbing at him.  Two men were struggling to restrain Pulley.

Regalado grabbed Pulley's right arm and Pulley released a small semi-automatic handgun.  As Regalado tried to hold onto Pulley's arm, Pulley stiffened in a manner that made Regalado think that Pulley was trying to grab the gun.  Regalado held Pulley's arm tighter, picked up the gun, and moved it beyond Pulley's reach.  Regalado then handcuffed Pulley with the assistance of other officers.

Misaalefua subsequently died at the hospital as a result of a gunshot wound to the chest.

Detective William Wallace interviewed Pulley on December 25, 2010.  A video of the interview was played for the jury at trial.  During the interview, Pulley told Wallace that when officers arrived at his home the first time on December 25, he was thrown to the ground, put in handcuffs, and placed in a patrol car for approximately 30 minutes.  Pulley said that at the time he did not know why this was happening.  When the police finally left, he walked over to Misaalefua's house to apologize for the disturbance.  According to Pulley, as he started to apologize to Misaalefua, Misaalefua hit him and knocked him to the ground.  Pulley got up, asked Misaalefua what was wrong with him, and then ran back to his house because Misaalefua was "just going crazy."  Pulley ran to the front door, went inside the house and grabbed his gun.  He ran around to the garage to close the garage door, but someone was standing near the door and it would not close.  Pulley ran outside and said, "Get the hell off my property," or something to that effect.  He explained to Wallace that after that point, he did not remember what happened, other than that he had been tackled.

Pulley told Wallace that he kept his .25-caliber pistol in a china cabinet by the front door in case of a home invasion.  He owned a number of guns and kept another gun by his bed.  Pulley explained that he grabbed the gun from the china cabinet on his way to close the garage door.  Pulley said that he did not remember the gun going off, and also did not remember taking the safety off of the gun to prepare to use it.  Pulley admitted that he had had "lots of weapons training" from his military experience, and said that he did not normally take the safety off of a gun when he grabbed one.

9

Pulley told Wallace that he had been drinking vodka that night.

c.      *Other evidence*

The parties stipulated that Pulley's blood alcohol level at the time of the shooting was approximately .19 percent. Misaalefua's blood alcohol level at the time of his death was .18 percent.

A criminalist with the San Diego County Sheriff's Department Crime Laboratory analyzed the Browning .25-caliber pistol and two expended cartridge cases. The pistol was working properly. It required six pounds of pressure to pull the trigger. The pistol had a magazine safety mechanism, which meant that it would not fire if there was no magazine in the weapon. The gun also had a manual safety.

The criminalist determined that the muzzle of the gun had been less than six inches from Misaalefua at the time it was fired.

A firearm expert testified that the pistol used in the shooting required a six-pound trigger pull, and that this was on the heavy side for a .25-caliber automatic pistol. In order to activate the safety of the .25 Browning pistol, a person must execute a very deliberate action, which makes it a relatively safe weapon.

4.      *Prior domestic violence evidence*

Pulley and Angela had been married for 21 years. Their relationship had been volatile. In 1993, Angela filed for a restraining order, alleging that Pulley hit her on the side of the head when he was drunk. The blow had caused her ear to ring for hours afterward. The court granted the restraining order, but Angela filed for a dismissal of the order a month later.

10

In 1994, Pulley came home drunk and began wrestling with and tickling his then eight-year-old son to the point that the child started crying. Angela said, "[T]hat's enough. Enough." She tried to separate the two. Pulley swung at Angela and hit her in the face, breaking her nose in three places. Angela did not call the police, but she took her children and drove herself to the hospital. After this incident, Angela applied for a restraining order, which the court granted. She subsequently moved to dismiss that restraining order, as well.

B.      *Procedural background*

On May 3, 2011, the San Diego County District Attorney filed an information charging Pulley with one count of murder (Pen. Code, § 187, subd. (a); count 1)[2]; one count of misdemeanor battery (§ 242; count 3); and two counts of criminal threats (§ 422; counts 2 and 4). With respect to the murder, the information alleged that Pulley intentionally and personally discharged a firearm resulting in death (§ 12022.53, subd. (d)) and personally used a firearm (§ 12022.5, subd. (a)).

A jury found Pulley guilty of second degree murder (count 1), battery (count 3), and one count of making a criminal threat directed at his son (count 2). The jury also found true the firearm allegations charged in connection with count 1. The jury found Pulley not guilty of one count of making a criminal threat directed at his wife (count 4).

The court sentenced Pulley to 40 years to life in state prison. Pulley filed a timely notice of appeal.

---

[2]      All statutory references are to the Penal Code unless otherwise specified.

III.

DISCUSSION

A.    *There is sufficient evidence that Pulley committed murder*

Pulley first contends that the evidence is insufficient to support his conviction for second degree murder because, he asserts, the only reasonable conclusion that a fact finder could reach from the evidence presented at trial is that he acted with legal justification in defending himself within his home.  Pulley's argument is, in essence, that the evidence established justified self-defense as a matter of law.  We disagree with Pulley's contention that the only reasonable inference from the evidence is that he had legal justification to kill Misaalefua.

When the sufficiency of the evidence is challenged, the court is not required to " ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  [Citation.]  Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must . . . presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]  The court does not, however, limit its review to the evidence favorable to the respondent. . . .  '[O]ur task . . . is twofold.  First, we must resolve the issue in the light of

12

the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent.  Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "[n]ot every surface conflict of evidence remains substantial in the light of other facts." ' [Citation.]" (*People v. Johnson*, *supra*, 26 Cal.3d at pp. 576-577, quoting *People v. Bassett* (1968) 69 Cal.2d 122, 138.)

Pulley relies on the presumption created by section 198.5 as support for his argument that his conduct in killing Misaalefua was legally justified.  Section 198.5 provides:

> "Any person using force intended or likely to cause death or great bodily injury within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury to self, family, or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

> "As used in this section, great bodily injury means a significant or substantial physical injury."

Section 198.5 was created "to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give 'the benefit of the doubt in such cases to the resident . . . .' [Citation.]" (*People v. Owen* (1991) 226 Cal.App.3d 996, 1005.)

Pulley argues that it was incumbent on the prosecution to prove beyond a reasonable doubt that Pulley's conduct in shooting Misaalefua was without legal

justification, and that there is insufficient evidence for the jury to have determined that he acted without that legal justification. A review of the record establishes that there is sufficient evidence that Pulley's conduct was not legally justified under section 198.5.

Pulley acknowledges that the jury was properly instructed concerning self-defense, voluntary manslaughter, and defense of home or property. With respect to defense of home and property, the jury was instructed with CALCRIM No. 506, as follows:

> "The defendant is not guilty of murder or manslaughter if he killed to defend himself or any other person in the defendant's home. Such a killing is justified, and therefore not unlawful, if:
>
> "1. The defendant reasonably believed that he was defending a home against Jimmy [Misaalefua], who violently or riotously or tumultuously tried to enter that home intending to commit an act of violence against someone inside;
>
> "2. The defendant reasonably believed that the danger was imminent;
>
> "3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; AND
>
> "4. The defendant used no more force than was reasonably necessary to defend against the danger.
>
> "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself or someone else. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, then the killing was not justified.
>
> "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the

14

defendant's beliefs were reasonable, the danger does not need to have actually existed.

"A defendant is not required to retreat.  He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death/bodily injury has passed.  This is so even if safety could have been achieved by retreating.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

We presume that the jury understood and followed this jury instruction (see *People v. McKinnon* (2011) 52 Cal.4th 610, 670), and thus we further presume that the jury properly considered whether the People met their burden of proving that Pulley was not justified in killing Misaalefua.  There is sufficient evidence to support a conclusion that the killing of Misaalefua was not justified.  In particular, there is sufficient evidence to support a conclusion that Pulley used more force than was reasonable in shooting Misaalefua.

Pulley and Misaalefua got into a physical altercation after Pulley walked over to Misaalefua's house on the night in question.  The evidence demonstrates that Pulley fell to the ground, either because he stumbled or because he was knocked down by Misaalefua, as the two were walking together toward Pulley's house.  At that point, Pulley started to threaten Misaalefua, saying, "I got something for you.  I got something for you, mother fucker."  This clearly took place before either man arrived at Pulley's house.  After these events, both men continued toward Pulley's home.  Pulley entered the house through an interior garage door, while Misaalefua stood in the garage, between five

15

and 15 feet away from that interior door, waiting for Pulley to return. The jury could have reasonably inferred that Misaalefua was not attempting to enter Pulley's home, and that Pulley could have avoided the entire incident if he had simply remained inside his house.

Instead, Pulley grabbed a firearm from inside his house and went back out to the garage where Misaalefua was standing. When Misaalefua saw the gun he said, " 'What are you going to do with that[?] Shoot me[?]' " Without any further physical threat from Misaalefua, Pulley fired a shot at Misaalefua. Only then did the two men begin to physically wrestle, and Pulley fired another shot.

It is clear from these facts that Pulley increased the violence in this altercation by, as the prosecutor argued, bringing a gun to what was, essentially, a fistfight. Further, because Misaalefua did not attempt to follow Pulley into Pulley's house, the jury could have reasonably concluded that the fight had essentially ended when Pulley walked inside the house and closed the door. Instead of locking the door or calling the police, Pulley grabbed a gun and walked back out to the garage and did what he had earlier essentially threatened to do, i.e., he gave "something" to Misaalefua. The jury could have concluded that in retrieving a gun and shooting an unarmed man, Pulley used more force than was reasonably necessary to protect himself or his house, and thus, that the presumption of justification embodied in section 198.5 had been overcome by contrary evidence.

Given the state of the evidence, we must uphold the jury's conclusion that Pulley was not justified in killing Misaalefua. Although, as Pulley has argued on appeal, a jury might have concluded that his conduct was justified, as long as the circumstances

16

reasonably justify the jury's findings, we will not reverse the jury's verdict simply because the evidence might support a contrary conclusion. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 408.) The circumstances more than reasonably support the jury's rejection of the justification defense in this case.

B.      *There is sufficient evidence that Pulley acted with malice, such that his conviction for second degree murder need not be reduced to voluntary manslaughter*

Pulley argues that even if this court disagrees that the only reasonable conclusion from the evidence is that he acted with legal justification, this court should nevertheless reduce his conviction to voluntary manslaughter on the ground that the evidence demonstrates, at most, that he acted pursuant to the heat of passion, and that there is thus insufficient evidence that he acted with the requisite malice required for second degree murder. We reject this argument, as well.

We apply the same standards for reviewing a claim of insufficiency of the evidence that we set out in part III.A., *ante*, in considering Pulley's related sufficiency claim.

Murder is the unlawful killing of a human being "with malice aforethought." (§ 187, subd. (a).) Pulley was convicted of second degree murder, which is "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) Malice may be either express (as when a defendant manifests a deliberate intention to take away another person's life) or implied. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) "Malice

17

is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . ." (*Knoller*, *supra*, at p. 143.)

Malice may be, and often must be, proved by circumstantial evidence. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946; *People v. James* (1998) 62 Cal.App.4th 244, 277.) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact." (*People v. Lashley*, *supra*, at pp. 945-946.)

Pulley contends that the evidence showed that he acted not with express or implied malice, but instead, pursuant to the heat of passion, such that the element of malice was negated. He argues that the prosecution failed to prove malice aforethought because it failed to prove the absence of provocation and heat of passion beyond a reasonable doubt. Pulley maintains that we should find that provocation and heat of passion existed as a matter of law, and reduce the offense to voluntary manslaughter. We reject Pulley's contentions.

18

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)  Heat of passion has both objective and subjective components.  (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).)  To satisfy the objective component, the claimed provocation must be sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, from passion rather than from judgment.  (*Id.* at p. 550.)  "The provocation . . . must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."  (*Id.* at pp. 549-550.) A defendant may not " ' "set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused. . . ." ' "  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215-1216, quoting *People v. Steele* (2002) 27 Cal.4th 1230, 1252.)  "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."  (*Moye*, *supra*, at p. 550.)

Pulley correctly points out that when murder and voluntary manslaughter are under consideration, the burden is on the prosecution to prove, beyond a reasonable doubt, the absence of a sudden quarrel or heat of passion, in order to establish the malice element of murder.  (*People v. Rios* (2000) 23 Cal.4th 450, 454.)  However, "[e]ven if defendant's testimony provided some evidence of provocation for the jury to consider, it remains the jury's exclusive province to decide whether the particular facts and

19

circumstances are sufficient to create a reasonable doubt as to whether the defendant acted under a heat of passion. [Citations.]" (*People v. Bloyd* (1987) 43 Cal.3d 333, 350.) " 'The jury [is] not required to accept defendant's version of the killing. [Citations.]' [Citation.]" (*People v. Harris* (1971) 20 Cal.App.3d 534, 537.) Here, the trial court properly instructed the jury as to both murder and voluntary manslaughter and we " 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions [citation]." (*People v. McKinnon, supra,* 52 Cal.4th at p. 670.)

The question before this court is whether, examining the entire record in the light most favorable to the judgment, a reasonable jury could have found that Pulley harbored the malice necessary to support a second degree murder conviction. We conclude that there was ample circumstantial evidence of an intent to kill (express malice), as well as evidence of an awareness of the risk to life and action in conscious disregard for life (implied malice).

The evidence showed that after having engaged in an altercation with Misaalefua, Pulley walked back to his house, saying, "I got something for you." He went into his house and retrieved a loaded gun. Pulley took off the safety of the gun, which required a very deliberate action, and walked back out to where Misaalefua was waiting. Pulley then shot at Misaalefua at close range, twice.[3] He had to apply six pounds of pressure to pull the trigger each time. Shooting at a person from very close range is a strong

---

[3]    One of the gunshots entered Misaalefua's chest from a distance of less than six inches.

20

indicator of an intent to kill. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690; see also *People v. Lashley*, *supra*, 1 Cal.App.4th at p. 945 ["The very act of firing a .22-caliber rifle toward the victim at a range and in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." Shooting at point blank range "undoubtedly creates a strong inference that the killing was intentional"].) Beyond this, there was evidence that Pulley was clearly aware of the dangerousness of bringing a loaded gun outside during an altercation, and taking the safety off, such that the jury could have inferred that Pulley acted with conscious disregard for life.

Even if Pulley was upset due to the altercation with Misaalefua, the evidence demonstrated that Pulley had separated himself from Misaalefua and that he had time to cool off and rationally consider his actions. Instead of remaining inside his house, or even reengaging in an unarmed physical confrontation with Misaalefua, Pulley purposefully retrieved a gun, walked back out to his garage, and shot his neighbor at close range. Although the initial altercation had come to an end, Pulley clearly decided not only to continue it, but to escalate it. From this evidence, the jury could have reasonably concluded that Pulley intended to kill Misaalefua, and that he was not sufficiently provoked or acting under the heat of passion when he shot at Misaalefua, so as to reduce the crime from murder to manslaughter. Pulley in effect is asking this court to reweigh the evidence and to reach a result different from the result that the jury reached. However, that is not our role in examining the sufficiency of the evidence to support a conviction.

21

C.  *The trial court did not abuse its discretion in denying Pulley's motion to sever the charge in count 4 from the other counts*

Pulley contends that the trial court denied him a fair trial by denying his motion to sever count 4, the charge arising from the threats to his wife on November 11, 2010, from the remaining counts.

The statutory authorization for joinder of criminal charges is set forth in section 954.  That section provides in relevant part:

> "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

In this case, it is clear that all of the offenses charged were of the same class, in that they were all violent crimes against another individual (battery, criminal threats, murder).  The offenses thus met the requirements of joinder under section 954, which Pulley concedes.

Even where criminal charges are properly joined pursuant to section 954, however, a trial court may exercise its discretion to order separate trials in the interests of justice.  "[A] determination as to whether separation [of the trial of offenses] is required in the interests of justice is assessed for abuse of discretion."  (*People v. Alvarez* (1996) 14 Cal.4th 155, 188.)

"In the context of severing charged offenses, we have explained that 'additional factors favor joinder.  Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be

22

tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance *to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.* [Citations.]' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050, italics added.)

"Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 27-28.)

Generally, in determining whether the trial court abused its discretion in denying a motion to sever, an appellate court must examine the record that was before the trial court at the time of its ruling. (*People v. Mendoza* (2000) 24 Cal.4th 130, 161.) However, "[e]ven if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*Id*. at p. 162.)

23

Pulley contends that the evidence concerning the incidents in counts 1 through 3 and the incident in count 4 would not have been cross-admissible, and further contends that the evidence was fairly strong as to the first three counts, but relatively weak as to count 4.[4] According to Pulley, the evidence about the threat against Pulley's wife prejudiced the jury against Pulley and made the jury less likely to conclude that he acted in self-defense or lacked the requisite mental state for second degree murder. The record does not support Pulley's contentions.

Specifically, it is clear that the evidence pertaining to counts 2, 3, and 4 would have been cross-admissible in separate trials of those counts because those counts all involved domestic violence perpetrated by Pulley against members of his family. Evidence Code section 1109 makes evidence of a defendant's commission of other *uncharged* acts of domestic violence admissible in an action in which the defendant is accused of an act of domestic violence. This dispels an inference of prejudice from the joinder of these offenses. Further, even if we were to assume that evidence as to the charge in count 4 would not have been cross-admissible with respect to the murder charge in count 1, we would still not conclude that Pulley demonstrated the existence of prejudice from the joinder of these charges. Pulley's suggestion that the joining of an allegedly weak case (count 4) somehow bolstered the admittedly strong case against him in counts 1 through 3 makes little sense. The fact that the jury acquitted Pulley of the charge in count 4 indicates that the jury was not convinced that he committed that crime.

---

[4] Pulley notes that he was, in fact, acquitted on that count.

24

It seems unlikely that the jury would have used evidence of a crime for which they acquitted him to conclude that Pulley was a bad character who was likely to have committed murder. It is clear that the jury considered each count on its own merits, and that it did not rely on some generalized notion of Pulley's bad character to find him guilty of any particular charge. There is simply no indication of any prejudicial "spillover" effect from the joining of the counts in this case.

Similarly, there is no reason to believe that the presentation of evidence pertaining to count 4 was likely to inflame the jury against Pulley generally. The evidence pertaining to the criminal threat charge involving Pulley's wife was not particularly egregious. If anything, the concern would be that the joining of count 1, the murder charge, might be likely to inflame the jury against the defendant and make it more likely that the jury would want to punish Pulley for the *other* charged offenses, including count 4. However, the jury did not convict Pulley on count 4. It would thus not be reasonable to conclude that the jury was inflamed by the murder charge in count 1, such that it was more likely to convict him of count 4.

To the extent that Pulley is arguing that it is not only the evidence of the criminal threat against his wife that was prejudicial, but also the prosecutor's presenting evidence of his uncharged acts of domestic violence in 1993 and 1994, we reject this argument, as well. First, the jury was specifically instructed that it could "not conclude from this evidence that the defendant has a bad character or is disposed to commit crimes." We presume that the jury followed this instruction. (See, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 574.) Indeed, it seems that the jury did not use this evidence to conclude

that Pulley had a bad character or was disposed to commit crimes, since the jury acquitted him on count 4—one of the domestic violence counts.

Further, it was clearly within the trial court's discretion to join the charges in counts 1 through 3, since they were all of the same class and occurred on the same date and close in time. In fact, Pulley does not argue that the joinder of counts 2 and 3 with count 1 was erroneous or prejudicial. Because counts 2 and 3 related to domestic violence toward Pulley's son, the evidence going to Pulley's earlier uncharged acts of domestic violence would have been admissible as to these counts, even if count 4 had been severed and prosecuted in a separate trial. Thus, any presumption of prejudice arising from the admission of this other bad acts evidence as a result of the joinder of count 4 with the other counts is dissipated.

We conclude that the trial court's ruling on Pulley's severance motion was not an abuse of discretion at the time it was made, and further conclude that the joinder of these charges in a single trial did not result in "gross unfairness" amounting to a denial of due process. It is simply not reasonably probable that Pulley would have obtained a more favorable verdict in separate trials of counts 1 through 3, and count 4. Pulley was acquitted on count 4, and the jury convicted him of second degree murder on count 1, a lesser offense than the charged first degree murder. Pulley was not deprived of his right to a fair trial or due process.

26

IV.

DISPOSITION

The judgment of the trial court is affirmed.


                                                                     AARON, J.

WE CONCUR:


_____
HALLER, Acting P. J.


_____
IRION, J.